KEITH H. and Sheri H. as the next friend of Jacob H., Plaintiffs,

v.

The JANESVILLE SCHOOL DISTRICT, Defendant.

No. 02–C–0622–C.

United States District Court, W.D. Wisconsin.

Sept. 25, 2003.

Ronald S. Stadler, Milwaukee, WI, for Plaintiffs.

Josephine K. Benkers, Quarles & Brady, Madison, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action in which plaintiffs Keith H. and Sheri H. (Jacob H.'s parents) seek judicial review of an administrative law judge's determination that, under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–1487, defendant Janesville School District provided Jacob with a free appropriate public education during the 2001 spring semester and 2001–02 academic year and that plaintiffs are not entitled to reimbursement for Jacob's private school tuition for the 2001–02 academic year. Plaintiffs seek a reversal of these determinations.

Currently before this court is defendant's motion for summary judgment. Jurisdiction is present under 28 U.S.C. § 1331; 20 U.S.C. § 1415(i)(3)(A). As explained in this court's *Procedures to be Followed on Motions for Summary Judgment,* a copy of which was given to each party with the Preliminary Pretrial Conference Order on December 14, 2000, I will view as undisputed defendant's proposed facts that plaintiffs do not contest specifically with proposed facts of their own that are based on record evidence. *See Procedures,* II.C ("Unless the party opposing the motion puts into dispute a fact proposed by the moving party, the court will conclude that the fact is undisputed"); *Id.*

at II.D.2 ("If you dispute a proposed fact, state your version of the fact and refer to evidence that supports that version.") The Court of Appeals for the Seventh Circuit has stated that "entry of summary judgment will be sustained 'where the nonmovant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts,' if on the basis of the factual record the movant is entitled to judgment as a matter of law." *Johnny Blastoff v. Los Angeles Rams Football Co.,* 188 F.3d 427, 439 (7th Cir. 1999) (*quoting Brasic v. Heinemann's Inc.,* 121 F.3d 281, 286 (7th Cir.1997)).

In this case, plaintiffs have failed to follow the procedures. For example, plaintiffs reply to defendant's proposed findings of fact as "disputed," but then do not offer any proposed facts of their own or, if they do offer such facts, do not cite to record evidence to support those facts. *See, e.g.,* PFOF #'s 11, 111, 112, dkt. # 19.

Facts contained in the parties' briefs will not be considered unless they were also included in the party's proposed findings of fact. *See Procedures,* I.B.4. Plaintiffs discuss in their brief the 2001–2002 individualized education plan team's discussion of Jacob's level of performance and the academic testing of Jacob performed by Scherz–Busch, Plts.' Br., dkt. # 18, at 14–15, but they do not propose these matters as findings of fact, thereby depriving defendant of the opportunity to rebut that evidence. Although I will not be considering the improperly proposed facts, the decision would be no different if I had considered them.

Defendant's motion for summary judgment will be granted. I find that the individualized education plan that defendant developed for plaintiff Jacob H. for the 2000–2001 and 2001–2002 school years

met the requirements of the Individuals with Disabilities Education Act.

For the purpose of deciding the pending motion for summary judgment, I find from the facts proposed by the parties and from the administrative record that the following facts are material and undisputed.

### UNDISPUTED FACTS

Jacob H. is a child with a learning disability and other health impairments who was previously enrolled in defendant Janesville School District. Beginning in kindergarten, Jacob was found to be a child with a disability as a result of a learning disability. This disability caused difficulties for Jacob in the areas of reading, math, written language and spelling. In addition to educational problems, Jacob's school career has been affected by emotional, social and behavioral problems. Socially, Jacob struggles in his interactions with both peers and adults. He exhibits aggressiveness, noncompliance, withdrawal, anger and frustration. These behaviors have been so significant that they caused defendant to be concerned about the safety of Jacob and others. For example, in January 2000, while Jacob was in third grade, Jacob was arrested for disorderly conduct after he went out of control at school and then left.

In the academic year 2000–2001, Jacob was in fourth grade at Wilson Elementary School in defendant's school district. Pursuant to the Individuals with Disabilities Education Act, defendant developed an individualized education plan and educational placement for Jacob. Jacob's fourth grade report card reflects average to above average grades of B's and C's.

Jacob's first semester of his fourth grade year was uneventful from a behavioral standpoint. In fact, his teacher described Jacob's behavior as "excellent." In the spring 2001 semester, Jacob started to have difficulties in unstructured settings, primarily on the playground at recess. For example, he kissed a girl on the cheek in January 2001. In February, Jacob gave a student a "bear hug" and later pushed a student on the playground, and left school without permission. In March, Jacob refused to follow directions and used inappropriate language in the lunchroom. He also left school without permission on two occasions. Despite Jacob's difficulties in unstructured settings during this semester, Jacob was interactive and participated in the classroom. His fourth grade journal demonstrates an expansion of his ideas, use of greater detail and better vocabulary, improved sequencing and improved complexity of thought. His journal also reflects improvements in spacing, capitalization, punctuation, and spelling.

During spring semester 2001, defendant identified in Jacob a pattern of playground misbehavior and "wanted to jump on it before things got serious." Defendant developed a point sheet and use of an "adjustment room" where Jacob would be sent if his behavior was inappropriate. School district staff also convened an individualized education plan team meeting and developed a behavioral plan to supplement Jacob's behavioral goals and objectives. The behavior team stated Jacob's level of performance as: "He currently resists accepting responsibility for poor choices, has difficulty expressing his feelings appropriately, and seldom interacts with peers in a positive manner." The team identified the following goals for Jacob: 1) to appropriately express himself; and 2) to follow directions within five minutes. These goals were easily measurable and directly tied to the behavior problems identified by defendant. The plan scheduled a follow-up by April 5, 2001, less than a month after it was initially developed. Two weeks after implementing the plan,

defendant convened a network team meeting to address some continuing behavioral concerns. Also, defendant transferred Jacob to the class of special education teacher Nanette Rehling for a portion of his day. Rehling described Jacob's behavior in her class as "impeccable." Four days later, the network team referred Jacob for further special education evaluation. Plaintiffs also sought an evaluation from Nira Scherz–Busch, a private psychologist, and David Isrealstam, a private psychiatrist, because they believed that Jacob's efforts to avoid school had escalated and that he had problems reading and writing. In May 2001, Dr. Isrealstam recommended that Jacob not attend school because he was under too much stress. As a result, Jacob's individualized education plan team changed his educational placement from Wilson Elementary School to a "homebound" program, which allowed him to receive instruction from a Janesville School District teacher at home or in a setting other than the school building. Teacher Mary Caster met with Jacob at the public library and Rehling worked with Jacob at her home. During his homebound placement, Jacob received satisfactory grades and did exceptionally well in both social studies and language. Defendant's response to Jacob's misbehavior in spring 2001 was timely and appropriate.

Jacob's individualized education plan team reconvened on June 1, 2001 to discuss the results of his special education evaluation. The team considered reports from defendant staff and a preliminary report from Scherz–Busch, the private psychologist hired by Jacob's parents to evaluate him. Scherz–Busch suggested that Jacob might have social phobia, and the individualized education plan team agreed to continue evaluating Jacob and consider any additional information regarding possible social phobia. Jacob's homebound placement remained in effect because defendant believed Jacob needed to continue special education services during the summer of 2001.

On August 17, 2001, Isrealstam diagnosed Jacob with social phobia and post-traumatic stress disorder and stated that Jacob should not be enrolled in defendant's school district. When plaintiffs mentioned going back to school, Jacob immediately fled the room and hid under his bed. Jacob's individualized education plan team reconvened on August 24, 2001, but agreed to postpone decisions until Scherz–Busch's final report was available. Jacob began attending Walbridge Academy in August 2001. Walbridge charged plaintiffs tuition for 31 "visits" between August and December 2001.

The individualized education plan team reconvened on September 15 and October 2, 2001, after Scherz–Busch's final report became available. On October 2, 2001, the team finished revising Jacob's individualized education plan and changed his placement from the homebound program to Jackson Elementary School, also within defendant's district. Plaintiffs rejected the Jackson School placement on October 17, 2001, complaining that it did not provide their son with a free appropriate public education, as required by the Individuals with Disabilities Education Act. Staff who would have worked with Jacob at Jackson are certified in special education and have the expertise Jacob needs.

On December 27, 2001, defendant received notice from the Department of Public Instruction that plaintiffs were home schooling Jacob. On January 15, 2002, plaintiffs requested a due process hearing, demanding compensatory education for the spring 2001 semester and reimbursement of Jacob's Walbridge Academy tuition for the 2001–2002 school year.

During the due process hearing, the parties stipulated that Jacob's individualized education plan for the 2001–2002 school year was reasonably calculated to confer educational benefit. In fact, they agreed that it was "wonderful." After reaching this stipulation, the parties agreed that the remaining question for the administrative hearing was whether Jacob was capable of attending Jackson School for any part of the day during the 2001–2002 school year. If so, defendant had made a free appropriate public education available to Jacob.

At the hearing, Isrealstam expressed opinions regarding Jacob's ability to attend Jackson School. Isrealstam admitted that he had formulated his opinions with minimal information obtained directly from Jacob but with information from Jacob's mother and from Scherz–Busch. Scherz–Busch believed that Jacob was incapable of attending school in defendant's school district. Although she did not diagnose Jacob with social phobia or posttraumatic stress disorder because she is not an expert in the area and her clinic did not have enough information on Jacob to make such a diagnosis, she did observe signs of "trauma" in Jacob, such as his "not answering questions" and "not maintaining eye contact." Scherz–Busch also reported several negative comments Jacob made about school and noted that he bolted out of the room while being tested in an unfamiliar setting. Karen Grede, Jacob's private psychotherapist, stated that Jacob "is very school phobic" and "really afraid of people" but admitted that she is not an expert who can make a definitive diagnosis. When Grede tried talking to Jacob about school, Jacob would ask her to shut up or stop talking. Grede concluded that Jacob did not want to attend school in Janesville.

Jacob's mother testified that she had advised defendant that Jacob's behaviors were being caused by his frustration over not being able to read and his tendency to write letters backwards. Jacob's mother strongly believed that Jacob could not attend school in Janesville, noting that "anyone from Wilson school [Jacob] associated as bad—and if he saw someone—red flags would fly and panic mode would ensue." At the hearing, defendant's witnesses, experts in treating children and adolescents with behavioral issues, stated that Jacob would have been able to attend Jackson School during the 2001–2002 school year. These witnesses based their opinions on their observations of Jacob's behavior. One expert witness, Rehling, evaluated Jacob when he was first identified as a child with a disability. She had daily contact with Jacob at Wilson Elementary School the week before he stopped attending in spring 2001. She also worked with him during his homebound placement in summer 2001 and at the start of the 2001–2002 school year. Rehling testified that Jacob did not seem scared, fearful or anxious when meeting with Rehling in her home but did want to continue having fun rather than work on academics. However, Jacob was excited to work on a Pokemon alphabet with Rehling. At the start of the 2001–2002 school year, Rehling took Jacob to Dairy Queen and other places to work on the Pokemon alphabet.

Rehling testified that she had some contact with Jacob after plaintiffs discontinued Jacob's program with defendant and saw no indication that her presence scared him or made him feel anxious. Kathy White, defendant's assistive technology specialist, also reported very positive interactions with Jacob in August 2001. Although Jacob was reluctant at first, White testified that "within a few minutes he was very much so engaged in what I asked him to do ... he was very cooperative ... we had a few smiles ... he could actually produce written material and I think it started to take down some of those barri-

ers for him." Diane Brandt, an occupational therapist for defendant, testified that her evaluation produced similar results, noting that Jacob was very relaxed and interested in the assessment material.

Another expert for the defendant, David Cipriano, testified about his evaluation of Jacob. Although Cipriano could not guarantee that any certain placement would work for a child like Jacob, he indicated that there should have been an effort to return Jacob to defendant school district. He testified that he had raised the subject of school with Jacob during an interview and that Jacob had exhibited no adverse reaction. Jacob reported riding his bike to school and attending a carnival there since he stopped attending Wilson Elementary School. When Cipriano asked Jacob specifically about attending Jackson Elementary School, Jacob said "I got to do it" without any sign of anxiety. According to Cipriano, if Jacob did suffer from social phobia, "exposure treatments have been found unequivocally to be the most effective psychotherapeutic treatment." Cipriano testified that Jackson Elementary School would have been appropriate for Jacob, even if Jacob was resistant to attending a school with a large number of children. Cipriano testified that defendant would have permitted Jacob to use a separate entrance to the building that would have allowed him to come directly into the special education room. Jacob's individualized education plan indicates that he would have entered the school when other children were not in the hall. Once in the classroom, Jacob's class size would have been smaller than a typical class at the Walbridge Academy.

Plaintiffs testified at the hearing that they believed that "panic mode would ensue" if Jacob went to a school in defendant's district and for that reason, they had placed him at Walbridge Academy with his brothers. Walbridge typically educates learning disabled children as opposed to children whose primary needs are social, emotional or behavioral. Jacob's primary needs are social, emotional and behavioral. Barbara Jull, Walbridge Academy principal, testified that it took her staff approximately six months to get Jacob to attend a class regularly, even though Walbridge is a small school of approximately 30 students. Jacob did not attend Walbridge regularly until March or April 2002 and when he did attend, he received limited instruction in phonics and robots from Jull. Jull is not certified in any area of special education. She reported that she "had not met anybody with the level of difficulty as Jacob." Jacob did not have a behavioral plan at Walbridge. Scherz–Busch supports the Walbridge placement, but insists that a behavioral plan with very specific components is critical for Jacob. Walbridge staff did not seek assistance in developing behavioral strategies for Jacob and had no contact with any mental health professionals to develop strategies to assist him.

At the hearing, administrative law judge Mayumi M. Ishii did not exclude testimony of plaintiffs' experts. However, in her decision, she disregarded Isrealstam's conclusions regarding Jacob's ability to attend Jackson Elementary School. She explained that she could not rely on Isrealstam's opinions because "he relied entirely on information from the student's mother to make his diagnoses and prescribe treatment." Isrealstam also "took no relevant information from the student nor did he make any specific observations of the student." She did not rely on Grede's testimony because she believed that Grede did not have sufficient information about Jacob to develop a reliable opinion regarding his ability to attend Jackson Elementary School. In her final decision, the administrative law judge concluded that: 1) the

school district had provided a free appropriate public education to Jacob during the spring 2001 semester; 2) the individualized education plan developed for the 2001–2002 school year was reasonably calculated to provide free appropriate public education to Jacob; 3) plaintiffs were not entitled to tuition reimbursement for the 2001–2002 academic year; 4) she did not have the statutory authority to award attorney's fees; and 5) the school district was the prevailing party. *Janesville School District, Wisconsin State Educational Agency*, 38 IDELR 25, LEA–02–003 (Oct. 4, 2002).

## OPINION

### A. *Summary Judgment Standard Under Individuals with Disabilities Education Act*

The Individuals with Disabilities Education Act (formerly the "Education of the Handicapped Act") was passed in 1975 in response to Congress's perception that handicapped children in the United States were being excluded from educational opportunities. *Rowley*, 458 U.S. at 179, 102 S.Ct. 3034 (discussing legislative history of the act). The act's goal is to insure a free appropriate public education for all children with disabilities. 20 U.S.C. § 1412(a)(1)(A). "Under IDEA, a [free appropriate public education] is an educational program 'specifically designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction.'" *Board of Education of La Grange School District v. Illinois State Board of Education*, 184 F.3d 912, 915 (7th Cir.1999) (*quoting Board of Education of Murphysboro v. Illinois Board of Education*, 41 F.3d 1162 (7th Cir.1994)). The act attempts to achieve this goal by conditioning federal funding on state compliance with a variety of substantive and procedural obligations. 20 U.S.C. § 1412 (establishing eligibility requirements for states to qualify for assistance under the Individuals with Disabilities Education Act).

The act requires identification and evaluation of children with disabilities that need special services as a result of their disabilities. Once a child has been identified as disabled under the act, the state must assemble a team to evaluate the child and develop an individualized education plan tailored to the unique needs of the child, 20 U.S.C. §§ 1401(11) and 1414(d), which sets forth the child's educational level, performance and goals and is the governing document for all educational decisions concerning the child. *Board of Education, No. 218, Cook County v. Illinois State Board of Education*, 103 F.3d 545, 546 (7th Cir.1996). The school district must determine the child's category of eligibility in accordance with both federal and state regulations. 34 C.F.R. § 300.7; Wis. Admin. Code ch. PI 11.

The standard of review of administrative agency decisions under the Individuals with Disabilities Education Act is provided by 20 U.S.C. § 1415(i)(2)(B):

> In an action [challenging an administrative decision], the court-
>
> (I) shall receive the records of the administrative proceedings;
>
> (ii) shall hear additional evidence at the request of a party, and;
>
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

Instead of applying a highly deferential standard of review and treating the state administrative findings as conclusive if supported by substantial evidence, the district court "must independently determine whether the *requirements of the Act have*

been satisfied." *Murphysboro,* 41 F.3d at 1166. "However, because courts do not have special expertise in the area of educational policy, they must give 'due weight' to the results of the administrative decisions and should not substitute 'their own notions of sound educational policy for those of the school authorities which they review.' " *Id.* (*quoting Board of Education of Hendrick Hudson Central School District v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)); *see also Roy and Anne A. v. Valparaiso Community Schools,* 951 F.Supp. 1370, 1373 (N.D.Ind.1997) (describing standard of review as lying "somewhere between the deferential and the de novo"). " 'Due weight' necessarily implies some sort of deference" to the decisions of state hearing officers. *Murphysboro,* 41 F.3d at 1167. *La Grange School District,* 184 F.3d at 917 (describing court's review of hearing decisions as "extremely deferential").

The court's decision is based on the preponderance of the evidence. *See* 20 U.S.C. § 1415(i)(2)(B)(iii). The party challenging the outcome of the state administrative decision bears the burden of proof. *Board of Education of Community Consolidated School District 21 v. Illinois State Board of Education,* 938 F.2d 712, 716 (7th Cir.1991).

### B. *Free Appropriate Public Education*

As an initial matter, it should be noted that Jacob's learning disability is not in dispute. Because Jacob is disabled, the Individuals with Disabilities Education Act requires that defendant provide Jacob with a free appropriate public education in the least restrictive environment. *See* 20 U.S.C. § 1412(a)(1) and (5). A free appropriate public education comprises: (1) special education and (2) related services. *See* 20 U.S.C. § 1401(8). "Special education" is defined as "specially designed instruction, at no cost to parents, to meet the unique needs of child with a disability, including (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and other settings; and (B) instruction in physical education." See 20 U.S.C. § 1401(25). "Related services" are defined as:

> [T]ransportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(22). The Supreme Court has held that a state satisfies the free appropriate public education requirement if it provides personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. *Rowley,* 458 U.S. at 203, 102 S.Ct. 3034. "Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP." *Id.*

The Supreme Court has also held that a court's inquiry to determine whether free appropriate public education has been provided as required under the Individuals with Disabilities Education Act is twofold: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the

Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034. This inquiry includes the determination whether the state has created an individualized education plan that conforms with the requirements of the act. *Id.* at 207 n. 27, 102 S.Ct. 3034. "Once the school district has met these two requirements, the courts cannot require more; the purpose of the IDEA is to 'open the door of public education' to handicapped children, not to educate a handicapped child to her highest potential." *Murphysboro*, 41 F.3d at 1166. Neither party puts into dispute the school district's compliance with procedures set forth in the Individuals with Disabilities Education Act. Therefore, the central issue in this case is whether defendant reasonably calculated the individualized education plan to provide some educational benefit to Jacob in the spring 2001 semester and the 2001–2002 school year.

Jacob's plan includes, among other things,

a statement of the *special education and related services* and supplementary aids and services to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child -

(I) to advance appropriately toward attaining annual goals;

(II) to be involved and progress in the general curriculum in accordance with clause (I) [discussing a statement of the child's present levels of educational performance] and to participate in extracurricular and other nonacademic activities; and

(III) to be educated and participate with other children with disabilities and nondisabled children in the activities described in this paragraph.

20 U.S.C. § 1414(d)(1)(A) (emphasis added). Parents are part of the individualized education plan team, which develops the plan. *See* 20 U.S.C. § 1414(1)(d)(B)(i); 20 U.S.C. § 1414(3). The state or local educational agency must provide parents with an opportunity to "participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision or a free appropriate public education to such child, and to obtain an independent educational evaluation of the child." 20 U.S.C. § 1415(a) & (b). The individualized education plan encompasses both the specialized education and related services components of a free appropriate public education.

█ It should be noted that "[t]he school district is required by the statute and regulations to provide an appropriate education, not the best possible education, or the placement the parents prefer." *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1057 (7th Cir.1997) (internal citations omitted).

1. *Spring 2001*

█ The parties do not deny that defendant acted in a timely and appropriate fashion in response to Jacob's misbehavior in spring 2001. They also do not deny that Jacob received above average grades and that he demonstrated an expansion of ideas, use of greater detail and better vocabulary, and improved writing and spelling skills in fourth grade. However, *plaintiffs* allege that defendant failed to provide Jacob with some educational benefit during the spring 2001 semester. Plaintiffs appear to attribute the alleged lack of educational benefit to Jacob's underlying social, emotional and behavioral needs. Plaintiffs state that Jacob was frustrated with his reading and writing ability, that they informed the school of their belief that this frustration was a *cause of Jacob's*

behaviors, and that the school district's individualized education plan only addressed his social, emotional and behavioral needs. However, it is undisputed that Jacob's primary needs are social, emotional and behavioral, which is what the school district tried to address when it convened the individualized education plan team meeting in spring 2001. Furthermore, the goals of the plan were tied directly to the behavior problems identified by the defendant.

I understand plaintiffs to argue that the school district's response to Jacob's behavior in spring 2001 lacked the "specialized education" component of a free appropriate public education, as opposed to the "related services" component. Plaintiffs do not dispute that the supplementary behavioral plan of Jacob's plan was intended to address Jacob's social, emotional and behavioral needs, but they seem to argue that defendant ignored their advice about the cause of Jacob's misbehavior and therefore, that the school district's use of the point sheet and adjustment room did not sufficiently address Jacob's academic needs. This argument contradicts plaintiffs' belief that defendant's response to Jacob's misbehavior was timely and appropriate. In addition, it is undisputed that defendant transferred Jacob to a "special education teacher's class for a portion of his day" and later abided by Isrealstam's recommendation to take Jacob out of school and place him in a homebound program. Defendant's approach to Jacob's individualized education plan appears "specially designed" to meet Jacob's unique needs, which were more behavioral in nature.

Often, the combination of the student's progress and the school's particularized services is "dispositive" in determining whether a student has received a free appropriate public education. *See, e.g., Todd*

*v. Duneland School Corp.,* 299 F.3d 899, 905 (7th Cir.2002). If a student is placed in a regular class, the court can focus on a student's grades and his advancement from "grade level to grade level in examining whether the student benefitted educationally from the instruction." *Id.* In this case, Jacob was placed in the regular classroom for much of the spring 2001 semester, until Jacob's individualized education plan team changed his educational placement from Wilson Elementary School to a "homebound" program sometime in May 2001, at the recommendation of Jacob's private psychiatrist. Plaintiffs admit that even after the homebound placement, Jacob received satisfactory grades.

Nevertheless, plaintiffs maintain that good grades are not sufficient by themselves to show educational benefit or progress. Unfortunately, plaintiffs do not advance a reasonable argument or identify anything in the record to support the contention that Jacob did not make progress. For example, plaintiffs assert that defendant failed to present witnesses at the administrative hearing that could testify to Jacob's educational progression. However, Jacob's fourth grade teacher did testify at the hearing, stating that Jacob earned his grades, did a "nice" job in science, social studies and health, and "was making steady progress." Transcript of Proceedings, dkt. # 3, at 729–730. Plaintiffs also cite a statement made by Rehling about Jacob's needing an extended school year to prevent further regression as additional evidence that Jacob did not progress in spring 2001. Providing an extended school year does not necessarily imply regression. Agencies subject to Individuals with Disabilities Education Act are required to provide extended school year services if "a child's individualized education plan team determines, on an individual basis, that the services are necessary for the provision of FAPE to a child." 34 C.F.R. § 300.309(2)

(2002). Defendant argues that Jacob's extended school year was required to help Jacob continue to maintain his reading and writing success and not to address any deficiency in his education. Dfts.' Reply Br., dkt. # 20, at 7. The preponderance of the evidence supports defendant's argument. It is undisputed that Jacob continued to receive above average grades, even after being placed in homebound instruction and despite his increased behavioral problems.

Finally, plaintiffs argue that the changes in Jacob's individualized education plan from the end of the 2000–2001 school year to the 2001–2002 school year are evidence that the spring plan was insufficient. However, the revision occurred in response to a special education evaluation of Jacob's behavior change in spring 2001, a response that plaintiffs agree was timely and appropriate. Moreover, during the team's reevaluation of Jacob's special education needs, it considered the opinion of plaintiffs' private psychologist, Scherz-Busch, that Jacob may suffer from social phobia. It is not unusual to reevaluate and revise an individualized education plan; in fact, it is mandatory to do so at least once a year. See, e.g., Patricia P. v. Board of Education of Oak Park, 203 F.3d 462, 468 (7th Cir.2000) ("The IDEA requires a school district to convene a conference with the teacher(s) and the parent(s) to prepare an individualized education plan that assesses the level of special services that would be required in light of the child's disability, and 'then review and, if appropriate, revise, its provisions periodically, but not less than annually'") (quoting 20 U.S.C. § § 1401(a)(18)-(20), 1412(4), 1414(a)(5) (1996)).

The administrative law judge found that the individualized education plan implemented in spring 2001 provided educational benefit to Jacob, as shown by his grades, writing samples from January 2001 to March 2001, and the test scores administered by the school district. 38 IDELR 25, at 7 (Oct. 4, 2002). Plaintiffs fail to adduce evidence that Jacob regressed in his education during the spring of 2001 or that the bases for the administrative law judge's decision are unfounded. On appeal, the party challenging the outcome of the state administrative hearings bears the burden of proof. See, e.g., Murphysboro, 41 F.3d at 1167. Given the undisputed facts that Jacob achieved above average grades in spring 2001, that defendant school district responded promptly and appropriately to Jacob's behavioral needs, that there is no evidence of regression, and taking into account the due weight I must afford the state administrative proceedings, I find that defendant provided Jacob with free appropriate public education in spring 2001. Therefore, Jacob is not entitled to compensatory education for the spring 2001 semester.

### 2. 2001–2002 school year

■ The parties do not dispute that Jacob's individualized education plan for the 2001–2002 school year was reasonably calculated to confer educational benefit. Indeed, plaintiffs agree that the individualized education plan was "wonderful." As noted earlier, the Supreme Court has held that a court should make a two part inquiry in suits brought under the Individuals with Disabilities Education Act to determine whether a free appropriate public education has been provided: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" Rowley, 458 U.S. at 206–07, 102 S.Ct. 3034. "Once the school district has met these two requirements, the courts cannot require more;

the purpose of the IDEA is to 'open the door of public education' to handicapped children, not to educate a handicapped child to her highest potential." *Murphysboro*, 41 F.3d at 1166. In the proposed findings of fact, plaintiffs agree that defendant met both of the requirements set out by the Supreme Court. Nevertheless, they argue that the defendant's placement offer at Jackson Elementary was inappropriate. Plaintiffs' concession appears to resolve the issue against them. However, even if I assume that plaintiffs' concession was inadvertent, I agree with the administrative law judge that the 2001–2002 individualized education plan was reasonably calculated to enable Jacob to receive educational benefit.

Plaintiffs argue that the administrative law judge wrongly disregarded the testimony of Isrealstam and Grede. Isrealstam diagnosed Jacob with social phobia and posttraumatic stress disorder, formulating his opinion from information provided by Jacob's mother and from Scherz–Busch. From this diagnosis, Isrealstam concluded that Jacob should not be enrolled in the Janesville school district. Scherz–Busch and Grede come to the same conclusion. The administrative law judge found Isrealstam's opinions unpersuasive because he "relied entirely upon information from the Student's mother to make his diagnosis and prescribe treatment." The administrative law judge disregarded Grede's testimony as well because she did not have sufficient information about Jacob to develop a reliable opinion regarding his ability to attend Jackson Elementary School.

Plaintiffs carry the burden of proof when they challenge the administrative law judge's decision. *Murphysboro*, 41 F.3d at 1167. From his diagnosis, Isrealstam concluded that Jacob should not enroll in the Janesville School District.

Plaintiffs have not developed the reasoning behind Isrealstam's conclusion, leaving the court to hypothesize for itself why Jacob's diagnosis prohibits him from attending Jackson Elementary School or any other school in the Janesville School District. It is possible that plaintiffs meant to say that the size of the schools in defendant's school district would exacerbate the problems associated with Jacob's social phobia and posttraumatic stress disorder, whereas the smaller Walbridge Academy would alleviate Jacob's behavioral problems.

Even if I made this connection myself, plaintiffs do not dispute that Jacob's class size at Jackson Elementary would have been smaller than a typical Walbridge class and that his individualized education plan provided special accommodations to help him avoid contact with other children as much as possible. Regardless, I will not undertake to relieve plaintiffs of their responsibility under Fed. R. Civ. P 56(e) to construct a bridge between Jacob's diagnosis and his inability to attend school in defendant's school district. *Drake v. Minnesota Mining & Manufacturing Co.*, 134 F.3d 878, 887 (7th Cir.1998). ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.") Rather, I will defer to the opinions of trained educators. *See, e.g., Heather S.*, 125 F.3d at 1057 ("A court is particularly incapable of making [placement] judgments, which is why it must defer to trained educators and not substitute '[its] own notions of sound educational policy for those of the school authorities which they review.' ").

At the administrative hearing, Rehling, White and Brandt testified that Jacob was not afraid to work with educators in the defendant school district and that Jacob

would have been able to attend Jackson School during the 2001–2002 academic year. The administrative law judge found this testimony persuasive. Because plaintiffs do not deny that defendant's witnesses were experts in child emotional and behavioral disabilities and because of my obligation to give due weight to the administrative law judge's decision, I find that plaintiffs did not meet their burden of showing why a diagnosis of social phobia or posttraumatic stress disorder would prohibit Jacob from attending school in the Janesville School District.

Even if plaintiffs could establish a link in the record showing why Jacob's diagnosis is relevant to his inability to attend school in defendant school district, they fail to demonstrate why defendant school district is less appropriate than any other school, such as Walbridge Academy. Grede said Jacob is "school phobic," and plaintiffs admit that Jacob is "afraid of schools, not little boys [who attend schools]." Plts.' Br., dkt. #18, at 21. As noted by the administrative law judge, Grede's testimony indicates Jacob's general hatred of school, but not of any school in particular. The only evidence plaintiffs offer is Jacob's mother's testimony that if Jacob saw someone from Wilson school, "red flags would fly and panic mode would ensue." Yet plaintiffs do not dispute that when Jacob saw Rehling after they discontinued his program with defendant school district, he was not scared or anxious. Furthermore, the fact that Jacob rode his bike to and attended a carnival at Wilson Elementary School even after he stopped attending it casts doubt on plaintiffs' assertion that Jacob feared schools in the defendant school district. Plaintiffs do not deny that staff who would have worked with Jacob at Jackson are certified in special education and have the expertise Jacob needs. Plaintiffs also agree that it is not common for the Walbridge Academy to educate

children like Jacob whose primary needs are social, emotional and behavioral and that the school has limited special education resources and experience.

The administrative law judge noted from Dr. Cipriano's testimony that Jacob hated all schools, including Jackson Elementary School and Walbridge Academy. The administrative law judge concluded that given Jacob's positive response to Rehling and his ability to "go to Wilson Elementary School for events he perhaps found more interesting than attending class," Jacob would not be afraid of attending school in defendant school district or incapable of doing so. 38 IDELR 25, at 7 (Oct. 4, 2002). I see no reason to disturb the administrative law judge's decision. Plaintiffs have not shown that Jacob's diagnosis prohibits him from attending school in defendant's school district or that defendant is unable to meet Jacob's needs. In fact, the preponderance of the evidence shows that defendant school district was appropriate for Jacob. Therefore, I find that defendant provided Jacob a free appropriate public education in the 2001–2002 school year and that plaintiffs are not entitled to tuition reimbursement for the 2001–2002 academic year. Defendant's motion for summary judgment will be granted.

Plaintiffs request the court to remand to the administrative law judge the question whether Walbridge Academy was an appropriate placement for Jacob. In light of my decision to grant defendant's motion for summary judgment, the request will be denied as unnecessary. In addition, because plaintiffs are not the prevailing parties under the Individuals with Disabilities Education Act, they are not entitled to attorney fees under 20 U.S.C. § 1415(i)(3)(B).

## ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by defendant Janesville School District is GRANTED on defendant's claim under the Individuals with Disabilities Education Act;

2. Plaintiffs' motion to remand the question whether Walbridge Academy was an appropriate placement is DENIED as moot;

3. The clerk of court is directed to enter judgment for defendant in case no. 02–C–0622–C and close the case.