In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3044

JOEL HJORTNESS, A MINOR, BY AND THROUGH HIS
PARENTS AND LEGAL GUARDIANS ERIC HJORTNESS
AND GAIL HJORTNESS, ERIC HJORTNESS, AND
GAIL HJORTNESS,

*Plaintiffs-Appellants,*

*v.*

NEENAH JOINT SCHOOL DISTRICT,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
Nos. 05 C 648, 05 C 656—**William C. Griesbach**, *Judge.*

ARGUED JANUARY 18, 2007—DECIDED AUGUST 20, 2007
AMENDED NOVEMBER 14, 2007

Before BAUER, MANION, and ROVNER, *Circuit Judges.*

BAUER, *Circuit Judge.* Joel Hjortness and his parents brought a due process claim against the Neenah Joint School District ("the school district") for denying Joel a "free appropriate public education," in violation of the Individuals with Disabilities and Education Act ("IDEA") 20 U.S.C. § 1415. An administrative law judge ("ALJ") found in favor of the Hjortnesses, and the district court

reversed by granting the school district's motion for summary judgment. We affirm.

## I. Background

Joel has been diagnosed at various times with obsessive compulsive disorder, Tourette's disorder, attention deficit/hyperactivity disorder, autistic spectrum disorder, oppositional defiant disorder, and anxiety disorder. Despite these disorders, he is exceptionally bright with an IQ of 140.

Until May 2003, Joel attended public school at Shattuck Middle School in the Neenah Joint School District,[1] where he and his parents resided. In May 2003, Joel's parents withdrew him from Shattuck because they believed that the school district was not adequately addressing his behavioral needs. His parents enrolled him in private school: first, at the Kennan Academy in Menasha, Wisconsin until January 2004, and thereafter as a residential student at the Sonia Shankman Orthogenic School ("SSOS") in Chicago, Illinois.

In November 2003, the school district began its process of reevaluating Joel, as required by law. The school district planned to gather data and then to meet with Joel's parents to develop an individualized education plan ("IEP") for Joel. On March 12, 2004, a school psychologist, an occupational therapist, and an autism resource teacher from the school district observed Joel at SSOS and interviewed SSOS staff who had worked with him. Based on this observation and the results of other tests, the team concluded that Joel met the special education

---

[1] At Shattuck, Joel maintained a grade point average of 3.5 as a regular education student.

criteria for autism, other health impairment, and emotional behavioral disability.

The school district next developed an IEP for Joel. On April 22, 2004, the school district's special education director, a regular education teacher from Neenah High School and Shattuck Middle School, a special education teacher from each of these schools, a other health impairment consultant, and the three district staff members who had visited SSOS, Joel's mother, and her attorney met to develop the IEP. At the IEP meeting, the team discussed Joel's strengths and weaknesses. The team also discussed general goals for Joel's education, which included giving Joel instruction in a small group setting. They identified one specific goal: that Joel would raise his hand at least 50% of the time when appropriate. No other specific goals or short-term objectives were identified at the meeting.

After the IEP meeting, school district staff prepared Joel's IEP for May 17, 2004 through May 16, 2005. The IEP specified four goals: (1) Joel will demonstrate appropriate hand raising procedures 50% of the time in class; (2) Joel will increase his ability to follow directions given by authority figures by 50%, as measured by a teacher monitoring system; (3) Joel will increase his ability to interpret a situation and respond appropriately in 50% of situations, as measured by a monitoring system; and (4) Joel will increase his ability to respond appropriately when in competitive situations 50% of the time, as measured by a staff monitoring system. Of the four goals, only the first was explicitly discussed at the IEP meeting. The remaining goals were identical to the goals in Joel's previous IEP, except that the percentages specified were lower than the percentages identified in the preceding IEP, and the short term objectives in support of each goal varied from the short term objectives in the preceding IEP.

On June 18, 2004, Joel's parents requested a due process hearing to seek reimbursement for placing Joel at SSOS. The ALJ found that the school district complied with the substantive requirements of the IDEA by providing Joel with an IEP that was reasonably calculated to provide him with some meaningful educational benefit. The ALJ also found that the school district had committed a procedural violation of the IDEA because Joel's IEP was not substantially developed and the school district had decided to place Joel in its school before the IEP meeting, thereby denying him a free appropriate public education. As a result, the ALJ ordered the school district to reimburse the Hjortnesses $26,788.32 for the cost of Joel's private school placement. The school district and the Hjortnesses both appealed this decision to the district court. The school district moved for summary judgment, which the district court granted. The Hjortnesses filed this timely appeal.

## II.  Discussion

Whether a school district has offered a free appropriate public education to a disabled student is a mixed question of law and fact. *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1053 (7th Cir. 1997). We review the administrative record and the district court's findings of fact deferentially, and we review questions of law *de novo*. *Bd. of Educ. v. Ross*, 486 F.3d 267, 270 (7th Cir. 2007).

The IDEA requires that the school district, as a recipient of federal education funds, provide children with disabilities a free appropriate public education in the least restrictive environment. *Id.* at 273. Specifically, the IDEA provides:

> To the maximum extent appropriate, children with disabilities, including children in public or private

institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). The IDEA requires that the state determine what is uniquely "appropriate" for each child's education by preparing an IEP developed through the joint participation of the local education agency, the teacher, and the parents. An IEP is defined as "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of this title." 20 U.S.C. § 1401(14). A child's placement must be based on the IEP. 34 C.F.R. § 300.552(b)(2). The statute assures the parents an active and meaningful role in the development or modification of their child's IEP. *Ross*, 486 F.3d at 274. The statute imposes both a substantive obligation and a procedural obligation on the state. *Id.* at 273-74.

### A.  Substantive Compliance

The Hjortnesses first assert that Joel's IEP was substantively inadequate because it failed to fully identify Joel's disabilities and his resulting needs, his present levels of educational performance, and his annual goals and short term objectives. We disagree.

To be substantively appropriate, the IEP must be formulated so that Joel would receive the "basic floor of opportunity [, consisting of] access to specialized instruction and related services which are individually designed to provide educational benefit to [him]." *Bd. of Educ. v.*

*Rowley*, 458 U.S. 176, 201, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982). To accomplish this, the IDEA requires, among other things, that the IEP include "a statement of the child's present levels of educational performance, including—(1) how the child's disability affects the child's involvement and progress in the general curriculum. . . ." 20 U.S.C. § 1414(d)(1)(A)(I).

As the ALJ indicated, considering that medical professionals have demonstrated difficulty in pinpointing Joel's disorders, it is unreasonable to expect the school district to do better in determining Joel's predominant or existing medical disorders. The school district properly considered the various medical diagnoses and educational assessments in determining that Joel met the criteria for autism and other health impairments.

Joel's "present levels of educational performance" did not reflect his current performance because current data was unavailable. Joel had not been attending school at the school district for almost a year, and SSOS was still in the process of observing Joel to gain insight on his behaviors. The school district gathered all the current information they could—by visiting SSOS, observing Joel, and meeting with his current teachers—and incorporated that data into his IEP.

Further, the Hjortnesses failed to present any evidence that Joel would not benefit educationally from the goals in his IEP. The goals and short term objectives were targeted to develop his social skills and would have provided Joel with some meaningful educational benefit. It was appropriate for the IEP to contain substantially similar goals and objectives as were contained in the preceding IEP.

**B. Procedural Compliance**

The Hjortnesses next assert that Joel's IEP was procedurally inadequate because (1) the IEP was written without Joel's parents' participation in the development of its goals and objectives, (2) the IEP was written without an SSOS representative at the IEP meeting, and (3) the school district made its placement decision before the IEP was written.[2] We disagree.

Procedural flaws do not require a finding of a denial of a free appropriate public education. However, procedural inadequacies that result in the loss of educational opportunity result in the denial of a free appropriate public education. *Ross,* 486 F.3d at 276.

Considerable time was spent in multiple IEP conferences at which Joel's parents and their advocate participated. At several times during these conferences, the team attempted to set specific goals and objectives, but the Hjortnesses insisted that "the issue on the table [was whether the school district would] pay for [Joel] to be at Sonia Shankman where he needs to be." The school district arguably should have held a second IEP meeting to review the goals and objectives that were not discussed at the meeting. However, this procedural violation does not rise to the level of a denial of a free appropriate public education. The record does not support a finding that Joel's parents' rights were in any meaningful way infringed.

We note that this determination in no way contravenes our decision in *Ross*. In *Ross*, the parents of a girl

---

[2] The Hjortnesses have not argued that the school district's placement was not based on the IEP, in violation of 34 C.F.R. § 300.552(b)(2).

with Rett syndrome[3] alleged, *inter alia*, that they were denied a meaningful opportunity to participate in the modification of their daughter's IEP, which constituted a procedural violation of the IDEA. 486 F.3d at 274. The *Ross* Court affirmed the district court's holding that the parents did in fact have a meaningful opportunity to participate in the comprehensive review of their daughter's situation and IEP, referencing a 32-page conference summary report of the seminal meeting at which they participated. *Id.* at 275. The consensus reached at the end of that meeting was to change the girl's placement; a decision that the girl's parents opposed. *Id*. However, the Court held that just because the placement was contrary to the parents' wishes, it does not follow that the parents did not have an active and meaningful role in the modification of their daughter's IEP, as required by the IDEA. *See id.* at 274-75.

In this case, it is not that Joel's parents were denied the opportunity to actively and meaningfully participate in the development of Joel's IEP; it was that they chose not to avail themselves of it. Instead of actively and meaningfully participating in the discussions at multiple IEP meetings, the Hjortnesses refused to talk about anything other than "[whether the school district would] pay for [Joel] to be at Sonia Shankman where he needs to be." As a result, the school district was left with no choice but to devise a plan without the meaningful input of Joel's

---

[3] Rett syndrome is a "neurodevelopmental disorder characterized by normal early development followed by loss of purposeful use of the hands, distinctive hand movements, slowed brain and head growth, gait abnormalities, seizures, and mental retardation." *Ross*, 486 F.3d at 269 (quoting National Institute of Neurological Disorders and Stroke, Rett Syndrome Fact Sheet, http://www.ninds.nih.gov/disorders/rett/detail_rett.htm?ccs=print).

parents. Under these circumstances, the parents' intransigence to block an IEP that yields a result contrary to the one they seek does not amount to a violation of the procedural requirements of the IDEA. To hold otherwise would allow parents to hold school districts hostage during the IEP meetings until the IEP yields the placement determination they desire.

Turning to the Hjortnesses' next argument, the IDEA did not require the school district to have an SSOS representative at the IEP meeting. A private school representative is only required to attend the meeting if the school district placed the child in the private school, *see* 34 C.F.R. § 300.349, which was not the case here. Even though they were not required to do so, the school district made quite an effort to ensure input from SSOS. The school district sent a team to SSOS to visit and interview Joel and his teachers. The school district also offered Joel's parents alternative meeting dates in an effort to allow them to invite SSOS to attend or participate by telephone. Even the resulting IEP included data from past evaluations, current observations, and teacher data that was supplied by SSOS. The school district also repeatedly offered to reconvene the meeting once more data from SSOS was available.

Finally, we turn to the appellants' main challenge—that the school district denied Joel a free appropriate public education because it predetermined Joel's placement. The ALJ found that the school district made its decision to place Joel in public school before the IEP was written. However, the IDEA requires that the school district educate Joel with his nondisabled peers to the "greatest extent appropriate." 20 U.S.C. § 1412(a)(5)(A). Recognizing that we owe great deference to the ALJ's factual findings, we find that the IDEA actually required that the school district assume public placement for Joel. Thus, the school district did not need to consider private place-

ment once it determined that public placement was appropriate.

We find that the district court did not err in finding that the IEP was reasonably calculated to provide Joel with some meaningful education benefit and that the school district did not deny Joel a free appropriate public education.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

ROVNER, *Circuit Judge*, dissenting. With respect, I believe that two procedural flaws in the IEP process compel reversal of the judgment. The ALJ found that before school officials met with Mrs. Hjortness to begin discussing the 2004-05 IEP, the school district already had "made up its mind to place the Student in a small group setting in the District schools under whatever IEP was formulated." R. 1 at 24; *id.* at 16 ¶ 32; *see also id.* at 23. The ALJ also found that most of the goals and short-term objectives incorporated into the IEP were determined after the April 22, 2004 meeting attended by Joel's mother and therefore were arrived at without the parents' input. *Id.* at 16 ¶¶ 33-35; *id.* at 23. Neither of these factual findings was clearly erroneous, and together they amply support the ALJ's conclusion that Joel's parents were deprived of meaningful participation in the IEP process and that Joel was deprived of a free appropriate public education.

The IDEA's presumption in favor of educating a disabled student with his nondisabled peers (*see ante* at 9, citing 20 U.S.C. § 1412(a)(5)(A)) does not permit a school district to circumvent the procedures that Congress has mandated by predetermining that a disabled student should be placed in one of its own schools. A placement decision is to be based on the IEP. 34 C.F.R. § 300.116(b)(2) (formerly § 300.552). The IEP is the "primary vehicle" for implementing the underlying goals of the statute. *Honig v. Doe*, 484 U.S. 305, 311, 108 S. Ct. 592, 597 (1988); *see also id.* at 311, 108 S. Ct. at 598 (Congress "envision[ed] the IEP as the centerpiece of the statute's education delivery system for disabled children."). It is the IEP that assesses the student's current educational performance, articulates a set of annual goals and short-term objectives in furtherance of those goals, and identifies the special education and other services necessary to help the student achieve those goals. 20 U.S.C. § 1414(d)(1)(A); *Honig*, 484 U.S. at 311, 108 S. Ct. at 597-98. A placement decision that is made before the IEP is drafted renders what Congress meant to be "the centerpiece of the statute's education delivery system for disabled children," *id.* at 311, 108 S. Ct. at 598, a meaningless formality. *See Bd. of Educ. of Township High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 274 (7th Cir. 2007) (if it were true that IEP meetings with parents "were nothing but an elaborate effort to ratify a decision that the District had already made without their input . . . then it would violate the IDEA"); *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 859 (6th Cir. 2004); *Spielberg v. Henrico County Public Schools*, 853 F.2d 256, 259 (4th Cir. 1988). Predetermination of a child's placement necessarily renders irrelevant what happens next in terms of meetings between school officials and the child's parents. Even if Joel's parents had been more cooperative with District officials in the IEP process, as my colleagues suggest they should have been, *see ante* at 8-9, it would

have made no difference given that the District, as the ALJ found, had already decided where to place him. Whatever opportunities Mr. and Mrs. Hjortness were given to participate in the development of the IEP, and however substantively appropriate the IEP was on its face, the IEP process in this case served merely to justify a placement decision that the District made unilaterally before IEP meetings with the parents were convened. That is exactly what this court in *Ross* (and our sister circuits in *Deal* and *Spielberg*) said is forbidden. 486 F.3d at 274.

Likewise, an IEP that is drafted largely in the absence of a student's parents is not the product of the interactive process that Congress required. *See, e.g.*, *W.G. v. Bd. of Trustees of Target Range School Dist. No. 23*, 960 F.2d 1479, 1485 (9th Cir. 1992). The fact that Joel's parents were involved in the process prior to the development of the IEP (*see ante* at 7) is beside the point. The fact is, they were not actually involved in preparing the IEP, nor was the full IEP team reconvened for the parents' input once school officials had completed the plan. It is no answer to say that Joel's parents did not object to the ex parte drafting of the IEP once it was presented to them. *See* R. 33 at 14. That was not their burden. *See W.G.*, 960 F.3d at 1485. As the ALJ rightly observed, "it was the obligation of the District to recognize the procedural flaw[ ] and offer the Parents the opportunity to participating meaningfully in the development of the annual goals and objectives, and thereafter to discuss placement under the IEP as then appropriately developed." R. 1 at 23.

Because the procedure followed by the school district in this case was inconsistent with the core goals and requirements of the IDEA, I would reverse the district court's judgment and sustain the ALJ's determination that Joel's parents are entitled to reimbursement for the tuition they paid for Joel's private education in the 2004-05 school year.

I respectfully dissent.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*