FILED
United States Court of Appeals
Tenth Circuit

**August 26, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

NICHOLAS SYTSEMA, a minor, by
and through his parents, Jack and
Rebecca Sytsema,

      Plaintiff-Appellant-Cross-
      Appellee,

v.

ACADEMY SCHOOL DISTRICT NO.
20,

      Defendant-Appellee-Cross-
      Appellant.

Nos. 06-1304 & 06-1330

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:03-CV-02582-RPM)**

---

Michael C. Cook, Michael C. Cook, P.C., Colorado Springs, Colorado, for
Plaintiff-Appellant-Cross-Appellee.

Brent P. Benrud (Bruce Anderson and Susan M. Schaecher with him on the
briefs), Stettner Miller, P.C., Denver, Colorado, for Defendant-Appellee-Cross-
Appellant.

---

Before **MCCONNELL, EBEL,** and **GORSUCH**, Circuit Judges.

---

**EBEL**, Circuit Judge.

Plaintiff-Appellant Nicholas Sytsema brought suit, by and through his parents, against the Academy School District for reimbursement for his educational expenses pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq., ("IDEA" or the "Act"). The district court concluded that the Sytsemas were entitled to reimbursement for their expenses for the 2001–2002 academic year because the school district violated the Act's procedural requirements by never finalizing the draft individualized education plan (IEP) it provided to the Sytsemas. The court also concluded that the individualized education plan for the 2002–2003 academic year complied with all of the Act's requirements, and thus denied the Sytsemas' request for reimbursement for that period. Both parties now appeal.

We conclude that the district court erred in awarding relief to the Sytsemas for procedural differences in the 2001 IEP and we remand for the district court to consider whether the 2001 draft IEP substantively denied Nicholas a free appropriate public education (FAPE). In conducting this review, the district court should restrict its review to the draft IEP as written without considering any oral discussions that occurred between the respective parties. We further conclude that the 2002–2003 IEP complied with the IDEA requirements. Accordingly, we REVERSE the district court's decision granting the Sytsemas reimbursement for their expenses for the 2001–2002 academic year and we REMAND for

consideration of whether the written draft 2001 IEP denied Nicholas a FAPE. We AFFIRM the denial of reimbursement expenses to the Sytsemas for the 2002–2003 academic year.

## I.

Nicholas Sytsema was born in July 1998. Approximately two and a half years later he was diagnosed with autism.[1] Autism is a condition that "affects all areas of essential human behaviors such as social interactions, the ability to communicate ideas and feelings, imagination, fine and gross motor skills, and the establishment of relationship[s] with others." As a result of his condition, Nicholas has "severely delayed communication skills." This delay manifests itself in several ways, including the fact that "[Nicholas is] very much in his own world, [does] not respond to his name, [does] not make eye contact, and [does] not want to be part of any of the groups that [are] around him." Nicholas also has a short attention span and is easily distracted by movements outside.

During the period from Nicholas's diagnosis until his third birthday, Resources for Young Children and Families provided funding for an in-home program pursuant to the IDEA. As part of this in-home program, Nicholas received 16.5 hours of one-on-one therapy per week. When Nicholas turned

---

[1] As a result of this diagnosis, the parties do not dispute that Nicholas qualifies as a "child with a disability" for the purposes of the Act. See 20 U.S.C. § 1401(3)(A).

three, the responsibility for complying with the IDEA's requirements shifted to his local school district.  See 20 U.S.C. § 1412(a)(1)(A).  Pursuant to these requirements, the Academy School District (the "District") assessed Nicholas's learning skills during a "play-based assessment."  This assessment provided the foundation for an individualized education program ("IEP"), which the IDEA required the District to develop.

Subsequent to the assessment, Nicholas's parents met with District employees to review a draft IEP for the 2001–2002 school year ("2001 IEP") in May 2001.  The District's director of special education, a special education teacher, an occupational therapist, a social worker, and the District's autism specialist all attended the IEP meeting.  The draft IEP documented several items, including: (i) the data gathered during the assessment; (ii) Nicholas's levels of functioning, achievement, and performance; (iii) a statement of educational needs; (iv) a statement of goals and objectives; (v) a statement of special education needs and related services;[2] and (vi) a recommended placement.  To provide Nicholas with a free appropriate public education ("FAPE"), the IEP proposed a total of 10.75 hours of services per week.  A significant portion of that total—9.5 hours per week—would occur in an education placement in an integrated

---

[2] Related services include "transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education . . . ."  34 C.F.R. § 300.34(a)

preschool classroom, while the remainder—1.25 hours per week—would consist of additional educational services, such as speech and language services.

Nicholas's parents rejected the draft IEP's suggested placement due to their concerns about Nicholas's educational experience in an integrated classroom. The Sytsemas believed that the suggested placement would not have benefitted Nicholas. To support their position, the Sytsemas provided the District with letters from two behavior specialists, a neurologist, and a staff member at the JFK Center for Developmental Disabilities.

The District and the Sytsemas held another meeting on August 2, 2001. This meeting did not constitute an official IEP team meeting because several team members were out of town. At this meeting, the District offered to increase the total service hours to 20 hours per week. The District, however, never formally amended the IEP to reflect this offer. Due to their continued concerns about Nicholas's placement, the Sytsemas rejected the draft IEP shortly after the August 2, 2001 meeting. They instead continued Nicholas's at-home program at their own expense. The District did not complete a final IEP for Nicholas for the 2001–2002 academic year.

The District and the Sytsemas began discussions regarding an IEP for the 2002–2003 school year ("2002 IEP") in October 2002. In preparation for this IEP, the District evaluated Nicholas using both the Mullen Scales of Early Learning and the Vineland Adaptive Behavior Scales. The Sytsemas and the

District employees on the IEP team met on November 20, 2002, to discuss the 2002 IEP.  The 2002 IEP proposed a total of 25 hours of services per week.[3]  The plan included 20 hours per week in an integrated classroom, and 5 hours per week of one-on-one discrete trial training.[4]

Unlike the previous year, the District finalized the 2002 IEP and delivered it to the Sytsemas; however, the Sytsemas neither agreed to nor signed the 2002 IEP.  Instead, they continued the at-home program that consisted primarily of one-on-one instruction.  Beginning in November 2002, Nicholas's parents also enrolled him in a private preschool for nine hours per week.  Nicholas attended the private school with the help of an aide.  The Sytsemas paid for both the at-home program and the private school.

On November 15, 2002, the Sytsemas submitted their demand for an Impartial Due Process Hearing.  The Sytsemas claimed that the District violated the IDEA by denying Nicholas a FAPE and sought reimbursement for their expenses for the 2001–2002 and 2002–2003 academic years.  After a five-day hearing, the independent hearing officer ("IHO") determined that the 2001 IEP and the 2002 IEP were appropriate and that the District did not deny Nicholas a

---

[3] There is some dispute in the record regarding whether the IEP provided for 22.5 or 25 hours of service.  The actual IEP seems to indicate both.

[4] Discrete trial training is a teaching method used in Nicholas's at-home program.

FAPE for either school year. The IHO thus denied the Sytsemas' request for reimbursement.

The Sytsemas appealed the IHO decision to a Colorado administrative law judge ("ALJ"). In the course of reaching his decision, the ALJ adopted substantially all of the IHO's factual findings. Pursuant to 20 U.S.C. § 1415(g), the ALJ reviewed the record and rendered an independent decision affirming the IHO's conclusions.

Following the ALJ's decision, the Sytsemas filed a civil action in the United States District Court for the District of Colorado. The Sytsemas renewed their claim that the District had denied Nicholas a FAPE during the two academic years in question. After reviewing the administrative record and the applicable law, the district court reversed the ALJ in part. The court held that the 2001 IEP was procedurally deficient because the District failed to present the Sytsemas with a final IEP. Based on this deficiency, the court ordered the District to reimburse the Sytsemas for the expenses they incurred during the 2001–2002 school year. Both in the district court and here on appeal, the District did not dispute the reimbursement amount of $38,503.45, nor did it dispute that the at-home program provided Nicholas some educational benefit.

The district court affirmed the ALJ's ruling for the 2002–2003 school year. The court first determined that the 2002 IEP was not procedurally defective. The court then reviewed the portion of the administrative record addressing whether

the 2002 IEP was "reasonably calculated" to provide Nicholas with educational benefits.  In light of the administrative record, the court held that the 2002 IEP did not deny Nicholas a FAPE, and thus affirmed the ALJ's denial of the reimbursement claim for that year.

The Sytsemas appeal the district court's order affirming the ALJ's denial of reimbursement for the 2002–2003 school year.  The District has filed a cross-appeal seeking reversal of the district court's reimbursement order for the 2001–2002 school year.

**II.**

The IDEA provides the federal courts with a unique standard of review that differs from our typical deferential review of administrative proceedings.  See 20 U.S.C. § 1415(i)(2).[5]  Pursuant to the statute, a district court must independently review the administrative record and apply a preponderance of the evidence standard to decide if the requirements of the IDEA have been met.  L.B. ex rel. K.B. v. Nebo Sch. Dist., 379 F.3d 966, 973–74 (10th Cir. 2004).  During its review of the administrative record, the district court must "give 'due weight' to

_____

[5] § 1415(i)(2)(C) provides that:
In any action brought under this paragraph, the court--
  (i) shall receive the records of the administrative proceedings;
  (ii) shall hear additional evidence at the request of a party; and
  (iii) basing its decision on the preponderance of the evidence,
  shall grant such relief as the court determines is appropriate.
20 U.S.C. § 1415(i)(2)(C).

the hearing officer's findings of fact, which are considered *prima facie* correct." Id. at 974. We have dubbed this standard of review a "modified de novo" review. Murray ex rel. Murray v. Montrose County Sch. Dist. RE-1J, 51 F.3d 921, 927 (10th Cir. 1995). This court reviews the district court's conclusions using the same "modified de novo" review standard. L.B. ex rel. K.B., 379 F.3d at 974. Before evaluating whether the two IEPs comply with the requirements set forth in the IDEA, we first turn our attention to the Act itself.

The IDEA is a comprehensive statute aimed at helping states to provide educational services that address the needs of disabled children. The Act's stated purpose is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The FAPE concept is the central pillar of the IDEA statutory structure: states must provide all eligible students with a FAPE to receive federal funding under the IDEA. 20 U.S.C. § 1412(a)(1).

To provide an eligible student with a FAPE, states must develop an IEP for each qualifying student. O'Toole v. Olathe Dist. Sch. Unified Sch. Dist. No. 233, 144 F.3d 692, 698 (10th Cir. 1998). The IEP is a written document that provides the basic plan and goals for the student's education over the academic year. See

20 U.S.C. § 1414(d)(1)(A)(i).  The Act mandates that each IEP contain certain

types of information to ensure that it serves this purpose.[6]

State school officials develop each IEP through a collaborative process that

is a central characteristic of the IDEA framework.  See 20 U.S.C. § 1414(d)(1)(B)

(requiring that the IEP be developed by a team that includes the student's parents,

as well as a regular education teacher, a special education teacher, a

representative of the local school district, and a person who can evaluate the

various assessments conducted in advance of the IEP meeting).  This

collaborative approach places special emphasis on parental involvement.  See Bd.

---

[6] The IEP must contain, in relevant part:
(I) a statement of the child's present levels of academic achievement and functional performance . . . ;
(II) a statement of measurable annual goals, including academic and functional goals . . . ;
(III) a description of how the child's progress toward meeting the annual goals described in subclause (II) will be measured and when periodic reports on the progress the child is making toward meeting the annual goals . . . will be provided;
(IV) a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child . . . ;
(V) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class . . . ;
 . . .
(VII) the projected date for the beginning of the services and modifications described in subclause (IV), and the anticipated frequency, location, and duration of those services and modifications . . . .
20 U.S.C. § 1414(d)(1)(A).

of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 205 (1982) ("Congress placed . . . emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . ."). To ensure that parents are involved with the IEP process, the Act contains myriad procedural safeguards. See 20 U.S.C. § 1414(d)(3) & § 1415(a)–(d); MM ex rel. DM v. Sch. Dist. of Greenville County, 303 F.3d 523, 527 (4th Cir. 2002).

If parents believe that a school district violated the Act's procedural safeguards or failed to provide their child with a FAPE due to the IEP's substantive deficiencies, they can seek a due process hearing. See 20 U.S.C. § 1415(f). Subsequent to this hearing, either the parents or the school district can seek judicial review. See id. § 1415(i)(2). When a dispute reaches federal court, the court applies a two-step analysis based on the Act's dual emphasis on substance and procedure. First, the court determines whether the IEP development process complied with the Act's procedures. Rowley, 458 U.S. at 206. Second, the court evaluates whether the IEP's substance provided the student with a FAPE. Id. at 206–07. If the IEP satisfies both steps, then the school district has complied with the Act. Id. at 207.

An IEP's failure to clear all of the Act's procedural hurdles does not necessarily entitle a student to relief for past failures by the school district. Garcia v. Bd. of Educ. of Albuquerque Pub. Schs., 520 F.3d 1116, 1125–26 (10th

Cir. 2008); <u>Knable ex rel. Knable v. Bexley City Sch. Dist.</u>, 238 F.3d 755, 765 (6th Cir. 2001); <u>see also</u> <u>Urban ex. rel Urban v. Jefferson County Sch. Dist. R-1</u>, 89 F.3d 720, 726 (10th Cir. 1996) (holding that a procedural failure did not entitle a student to relief because that deficiency did not result in the denial of a FAPE). Instead, this court must determine whether the procedural error resulted in "substantive harm to the child or his parents"; "deprive[d] an eligible student of an individualized education program"; or "result[ed] in the loss of [an] educational opportunity." <u>Knable</u>, 238 F.3d at 765–66; <u>see also</u> <u>Garcia</u>, 520 F.3d at 1126 & n.4 ("[O]ur precedent hold[s] that procedural failures under IDEA amount to substantive failures only where the procedural inadequacy results in an effective denial of a FAPE."); <u>O'Toole</u>, 144 F.3d at 701 ("[T]echnical deviations from the requirements . . . do not render an IEP entirely invalid; to hold otherwise would exalt form over substance." (quotation marks omitted) (quoting <u>Urban</u>, 89 F.3d at 726)). In sum, then, the courts inquire whether the violation resulted in the denial of a FAPE.

If a school district has complied with the procedural requirements for the IEP, the court must turn its attention to whether the IEP was "reasonably calculated" to provide the child with "educational benefits." <u>Rowley</u>, 458 U.S. at 206–07. The IEP complies with the Act's substantive standards if it provides the disabled student with "[a] 'basic floor of opportunity' . . . [that] consists of access to specialized instruction and related services which are individually designed to

provide educational benefit . . . ." Rowley, 458 U.S. at 201. This court has interpreted the Rowley standard to require an educational benefit that is more than de minimis. Urban, 89 F.3d at 726–27; see also Rowley, 458 U.S. at 200 ("Implicit in the congressional purpose of providing access to a 'free appropriate public education' is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child." (emphasis added)). We have also recognized, however, that the Act focuses on providing disabled children access to public schools, and thus, does not require an education "guaranteed to maximize the child's potential." Urban, 89 F.3d at 727 (quotation marks omitted) (quoting Johnson ex rel. Johnson v. Indep. Sch. Dist. No. 4, 921 F.2d 1022, 1025–26 (10th Cir. 1990)). As a result, we apply the "some benefit" standard the Supreme Court adopted in Rowley.[7] See, e.g., O'Toole, 144 F.3d at 699.

_____

[7] The Sytsemas contend that the relevant standard requires a "meaningful benefit" whereby the student achieves "significant learning." In support of their argument, they cite Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171 (3d Cir. 1988). In Polk, the Third Circuit carefully analyzed the Act as well as the language in Rowley and held that the relevant standard should be characterized as a "meaningful benefit." Id. at 184; see also Deal v. Hamilton County Bd. of Educ., 392 F.3d 840, 862 (6th Cir. 2004) (analyzing Third Circuit precedent and adopting the "meaningful benefit" standard).

Admittedly, it is difficult to distinguish between the requirements of the "some benefit" and the "meaningful benefit" standards. We have applied the "some benefit" standard, and thus evaluate the case at bar with that standard in mind. See O'Toole, 144 F.3d at 699.

## III.

## A.

The parties do not dispute that the District violated the Act by failing to provide the Sytsemas with a final 2001 IEP. This failure, however, does not necessarily entitle the Sytsemas to reimbursement. See Knable, 238 F.3d at 765. The Sytsemas contend that they are entitled to reimbursement because the lack of a final IEP resulted in the denial of a FAPE. In response, the District asserts that the Sytsemas are not entitled to reimbursement because the procedural violation did not amount to the type of "substantive harm" that deprived Nicholas of a FAPE. We find the District's argument convincing and conclude that the district court wrongly decided that the lack of a final IEP denied Nicholas a FAPE.

As noted above, the Act provides for reimbursement for procedural violations only where that violation effectively denied the student a FAPE. See Garcia, 520 F.3d at 1126 (explaining that the relevant question is "whether the procedural defect . . . amounted to a substantive failure to 'provid[e] personalized instruction with sufficient support services to permit the child to benefit educationally'" (quoting Rowley, 458 U.S. at 203)). Although we have not yet had the occasion to consider the effect of a parent's conduct in this context, two of our sister circuits have concluded that a procedural violation does not deny a student an educational opportunity where the parents did not meaningfully participate in the IEP development process.

- 14 -

In MM ex rel. DM, the Fourth Circuit considered whether the Act entitled a student to reimbursement for a procedural violation similar to the one at issue in the case at bar. 303 F.3d at 533–34. In that case, the parents opted out of the IEP development process before the IEP team finalized the plan. Id. at 529. The parents then sought reimbursement for their at-home program based, in part, on the alleged procedural violation. Id. at 533. The Fourth Circuit's analysis focused on two factors. First, the court noted that the IEP development process conducted by the school district allowed for complete participation by the parents. Id. at 534. Second, the court observed that there was nothing in the record to indicate that the parents would have accepted any IEP that did not include reimbursement for the at-home instruction. Id. at 535. Based on the parents' "lack of cooperation" with the IEP development process, the court concluded that the absence of a finalized IEP did not result in lost educational opportunities for the student. Id.

The Seventh Circuit recently reached a similar result. See Hjortness ex rel. Hjortness v. Neenah Joint Sch. Dist., 507 F.3d 1060, 1065–66 (7th Cir. 2007). In Hjortness, the parents and the school district initially worked to develop an IEP. The parents, however, refused to discuss any options other than placing their son as a residential student at a private school. Id. at 1065. Thus, the school district drafted the IEP without the parents' participation. Id. at 1063.

The parents then sought reimbursement for the private school expenses by claiming that the school district had violated the Act's procedures because it had not allowed the parents to participate in the IEP development process. Id. at 1065. The Seventh Circuit flatly rejected the parents' claim because "they chose not to avail themselves" of the opportunity to participate in the development process. Id. at 1066. Under those circumstances, the court held that the district did not deny the student a FAPE. See id. ("[T]he parents' intransigence to block an IEP that yields a result contrary to the one they seek does not amount to a violation of the procedural requirements of the IDEA.").

MM ex rel. DM and Hjortness cast doubt on the Sytsemas' claim that the lack of a final IEP deprived Nicholas of a FAPE. The hearing officer's findings of fact indicate that the Sytsemas unilaterally terminated the IEP development process due to their concerns about the District's plan to place Nicholas in an integrated classroom. The Sytsemas made this decision in spite of the fact that the District had not yet finalized its offer for educational services. While we do not fault the Sytsemas for making a difficult decision regarding which educational resources they believed would best benefit Nicholas, that decision precluded them from meaningfully participating in the complete IEP development process. Thus, we conclude that the lack of a final IEP did not substantively harm Nicholas.

**B.**

Because the district court found a procedural defect with regard to the 2001 IEP, it did not take the next step of determining whether the draft 2001 IEP was substantive defective in denying Nicholas a FAPE. We think that matter is best addressed by the district court in the first instance. Accordingly, we remand this issue to the district court. However, before doing so, we address one legal matter that pertains to this inquiry which has been adequately presented to us in this appeal to assist the district court in its substantive analysis of the adequacy of the draft 2001 IEP. Specifically, we consider whether the district court should consider only the IEP itself, or whether it should extend its review to the offers made by the District during the August 2, 2001 meeting. The Sytsemas contend that the court must analyze only whether the provisions of the IEP, as written, substantively comply with the Act. The District, on the other hand, asserts that the court should consider both the written IEP as well as the subsequent offers. Based on the Act and the relevant case law, we conclude that the court should consider only the written IEP during its review.

Our consideration of this issue begins with the Act itself. The IDEA specifically defines an IEP as a written document: "The term 'individualized education program' or 'IEP' means a written statement for each child with a disability that is developed, reviewed and revised in accordance with this section . . . ." 20 U.S.C. § 1414(d)(1)(A)(i) (emphasis added). This statutory

- 17 -

definition is significant in light of the Supreme Court's direction that federal courts must determine whether a school district substantively complied with the Act by focusing on whether "the <u>individualized educational program</u> developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits[.]" <u>Rowley</u>, 458 U.S. at 207 (emphasis added). Taken together, the statutory definition of an IEP and the Court's command that the courts must focus the inquiry on the draft IEP as written.[8]

Our sister circuits' careful analysis of this issue supports our conclusion. The Ninth Circuit addressed a similar question in <u>Union School District v. Smith</u>, 15 F.3d 1519 (9th Cir. 1994). The school district in that case argued that the court should incorporate, as part of the court's substantive evaluation of the IEP, a placement offer not included in the IEP itself. The placement offer was not included in the IEP because the parents had refused to consider that placement. <u>Id.</u> at 1525. The court rejected the district's argument and held that it must restrict its analysis to the written document because doing so would eliminate difficult factual disputes about the specifics of an oral offer. <u>See id.</u> at 1526 ("We find that this formal requirement has an important purpose that is not

---

[8] The fact that the Sytsemas did not sign the draft 2001 IEP does not affect its status as an IEP. The statutory definition of an IEP does not require a parent's signature. <u>See</u> 20 U.S.C. § 1414(d)(1)(A)(i); <u>see also</u> <u>Lessard v. Wilton Lyndeborough Coop. Sch. Dist.</u>, 518 F.3d 18, 27 & n.4 (1st Cir. 2008) (analyzing an unsigned document that satisfied all of the Act's requirements as an IEP).

merely technical, and we therefore believe it should be enforced rigorously. The requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later . . . .").

More recently, the Sixth Circuit agreed with the decision in Union and explained, in dicta, that substantive analysis of an IEP should be confined to the written document. Knable, 238 F.3d at 768. The parents in Knable refused to agree to the district's proposed placement, and thereafter, the district never finalized the draft IEP. Id. In spite of this lack of cooperation from the parents, the court noted that the terms and underlying policies of the IDEA required the school district to provide the parents with a written IEP. Id. at 768. Thus, the court held that it would consider only the draft IEP as written to decide whether the district substantively complied with the Act. See id. ("[T]he Knables' refusal to agree on a proposed placement for [the disabled child] does not justify [the school district's] noncompliance with the IDEA. Thus, the only offer of placement that was appropriately before the district court was that specified in [the school district's] draft IEP . . . .").

Finally, a recent decision from the Fourth Circuit also supports our conclusion. See A.K. ex rel. J.K. v. Alexandria City Sch. Bd., 484 F.3d 672 (4th Cir. 2007). In A.K. ex rel. J.K., the school district offered the parents an IEP that did not specify a placement for the student. Id. at 676. The court held that it could not consider placement offers not included in the written IEP because

"[e]xpanding the scope of a district's offer to include a comment made during the IEP development process would undermine the important polices served by the requirement of a formal written offer . . . ." Id. at 682. One of these policies included assisting the parents' evaluation of the proposed IEP. Id.

Lastly, we take comfort that our conclusion is correct because the facts of the case at bar provide a perfect example of why the court should restrict its analysis to the draft IEP as written. At the August 2001 meeting, the District offered to amend several material aspects of the 2001 IEP in an attempt to resolve the impasse. The offer, however, was plagued by generalities; at best, it presented vague, hypothetical possibilities for settling the dispute between the District and the Sytsemas. In fact, according to the District, the offer provided no greater specificity than an increase in the aggregate number of service hours.

The courts cannot analyze the substance of an IEP based on such a factual record. Instead of embracing the difficult task of determining whether the draft 2001 IEP, as supplemented by the August 2001 offer, complied with the IDEA, we echo the language in Smith: "The requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later about [the specifics of the offer]." 15 F.3d at 1526. Moreover, given our own hesitancy to analyze the substantive deficiencies of an oral offer, we are reluctant to require parents to make a similar judgment regarding a proposed IEP without a final written offer. Therefore, we conclude that when

analyzing the substantive compliance of an IEP, the court should restrict our examination to the written document.[9]

## IV.

We now turn to the 2002 IEP.  The Sytsemas do not assert that the 2002 IEP development process violated any of the Act's procedural safeguards, and thus, we focus solely on their claim that the IEP's substantive shortcomings denied Nicholas a FAPE.  The Sytsemas contend that the 2002 IEP was substantively deficient because the IEP's sole teaching method was ineffective for Nicholas and because the IEP did not provide Nicholas with generalization skills.[10]  We disagree.  The Sytsemas' first argument fails because the record indicates that the IEP incorporated several teaching techniques, which in total,

---

[9] We recognize that with this determination we are splitting with the First Circuit's holding in C.G. ex rel. A.S. v. Five Town Community School District, 513 F.3d 279, 286 (1st Cir. 2008).  There, the First Circuit held that if parents obstruct an IEP development process, then a reviewing court must be able to consider evidence extrinsic to the written IEP.  Id.  Although we understand the First Circuit's rationale, we conclude that the statute's language and the policy concerns raised above trump the reasons underlying the totality of the circumstances review the court adopted in Five Town.  Further, this bright-line rule should not disadvantage a diligent school district because it is always able to tender to recalcitrant parents a final IEP that incorporates any rejected oral offers that it may have extended during the consultative process.

[10] Generalization is an educational concept that teaches a student how to apply lessons learned in one environment to circumstances faced in several environments.  For example, generalization focuses on teaching a child how to apply classroom lessons at home.

- 21 -

would have provided Nicholas with some educational benefit. The Sytsemas'
second argument fails because the 2002 IEP provided adequate generalization
services for Nicholas to receive some educational benefit. Thus, we affirm the
district court's decision to deny the Sytsemas reimbursement because the 2002
IEP provided Nicholas with a FAPE.

The Sytsemas first assert that the 2002 IEP denied Nicholas a FAPE
because the IEP relied exclusively on the errorless learning method, which had
previously proved ineffective for Nicholas during his at-home tutoring. Errorless
learning is a teaching technique often used with autistic children. The basic
method teaches children through the use of successful learning experiences. A
teacher creates these successful experiences by providing both the correct answer
and reinforcement to the child as part of the learning process. Although this
method can be enormously helpful for children that frustrate easily and are
resistant to demands, it can also hamper the learning progress of more passive
children. Thus, in certain circumstances, the exclusive use of the errorless
learning technique might deprive a student of a FAPE.

In the case at bar, however, the use of this method did not deprive Nicholas
of a FAPE. The record demonstrates that the errorless learning method was one
of several methods included in the IEP. In addition to errorless learning, the IEP
provided that the District would utilize: (i) discrete trial training; (ii) various
"reinforcement strategies"; (iii) "communication temptations"; (iv) "[t]ask

analysis of multi step actions"; and (v) "shaping procedures" to achieve the goals set forth in the IEP. Although errorless learning had proved ineffective for Nicholas during his at-home tutoring, nothing in the record suggests that combining this teaching method with several other techniques would render the IEP substantively deficient. The 22.5 hours of instruction per week—which included five hours of one-on-one discrete trial training similar to the methods used in the at-home tutoring—would have provided Nicholas with some educational benefit, and thus, we do not question the District's selected methodologies. See Rowley, 458 U.S. at 208 ("We previously have cautioned that courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.' . . . Therefore, once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States." (quoting San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 42 (1973)). Accordingly, the 2002 IEP did not deprive Nicholas of a FAPE in this regard.

The Sytsemas' second argument rests on the 2002 IEP's generalization plans, and proceeds in three parts. First, they argue that the 2002 IEP's inadequate generalization plans—including plans for both parent training and coordination with Nicholas's at-home program—deprived Nicholas of a FAPE. In the instant case, the 2002 IEP explicitly listed "[g]eneralization programs" as one necessary accommodation or modification. Therefore, the Sytsemas' argument

can prevail only if they can demonstrate that the lack of specific generalization plans would have limited Nicholas to a de minimis (or less) educational benefit.

The IHO, the ALJ, and the district court all recognized that the Sytsemas had significant experience and knowledge regarding autism and that they were directly involved with Nicholas's education. The IEP also provided for quarterly progress reports, an annual IEP meeting, and a parent–teacher conference once per semester. The combination of the Sytsemas' knowledge and experience with the IEP's provisions to keep the Sytsemas informed and engaged with Nicholas's education demonstrates that the lack of specific generalization plans would not have deprived Nicholas of a FAPE. We thus agree with the ALJ's and the district court's decisions that the lack of a specific reference to parent training and coordination with Nicholas's at-home program did not deny Nicholas a FAPE.

Second, the Sytsemas assert that Luke P. supports their argument.[11] In that case, the parents of an autistic student sought reimbursement for placing their son in a residential school. See Thompson R2-J Sch. Dist. v. Luke P., No. 05-cv-2248, 2007 WL 1879981, at *1 (D. Colo. June 28, 2007). The student faced significant generalization problems and was completely unable to apply the lessons he learned at school in any other environment. Id. at *4. The student's

---

[11] The Sytsemas' briefs cite to the IHO and ALJ opinions in that case. The district court opinion, released after the Sytsemas filed their briefs, is consistent with the IHO and ALJ opinions, and accordingly, we consider the more widely available district court opinion.

significant generalization difficulties prevented him from gleaning any on-going benefit from his education, and thus, the district court concluded that the school district denied the student a FAPE. See id. at *8 ("[W]hatever educational progress Luke made on the most fundamental life skills, such as feeding and toileting and communicating basic needs, was meaningless if there was no strategy to ensure that those skills would be transferred outside of the school environment . . . .").

Luke P. is inapposite to the instant case. Nothing in the record intimates that Nicholas faces generalization problems of the same magnitude and character as the student in Luke P. Accordingly, Luke P. does not persuade us that the lack of a specific reference to parent training and coordination in the 2002 IEP denied Nicholas a FAPE.

The Sytsemas final generalization argument is similarly unconvincing. Beginning in 2002, the District employed the Denver Model for educating autistic students. The Sytsemas contend that the 2002 IEP did not address the model's requirement that each education plan coordinate between a student's activities at school and home, and therefore denied Nicholas a FAPE. Ultimately, this argument raises the same issue we considered above—whether the IEP's lack of a specific reference to coordination plans limited Nicholas to a de minimis educational benefit—but does not present us with persuasive grounds to reach the opposite conclusion. Admirably, the Sytsemas have exhibited a great degree of

knowledge and involvement with their son's education. This involvement would have augmented Nicholas's educational experience and makes clear that he would have received some educational benefit if he had enrolled with the district. Accordingly, the district court correctly determined that the Sytsemas were not entitled to reimbursement for their expenses for the 2002–2003 academic year.[12]

## CONCLUSION

We REVERSE the district court's reimbursement of expenses to the Sytsemas based on the procedural failure of the school district to deliver a final IEP for 2001-02. We REMAND for the district court to consider whether the draft IEP, as written, for 2001-02 provides Nicholas with a FAPE. We AFFIRM the district's denial of reimbursement expenses to the Sytsemas for the 2002-03 academic year.

---

[12] The Sytsemas' citation to <u>Delaware County Intermediate Unit No. 25 v. Martin K.</u>, 831 F. Supp. 1206 (E.D. Pa. 1993), does not persuade us otherwise. In that case, the district court addressed the "close" question whether a substantial variance from a defined educational model denied a student a FAPE. <u>Id.</u> at 1220. Ultimately, the court relied on the deferential standard of review and agreed with the education appeals panel decision that the school denied the student a FAPE. <u>Id.</u> In the instant case, the variance from the Denver Model does not present such a close question because the record clearly demonstrates that the 2002 IEP would have provided Nicholas with more than a de minimis educational benefit.