In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3667

MARGARET TODD, as parent
and natural guardian of R.T.,

*Plaintiff-Appellant,*

*v.*

DUNELAND SCHOOL CORPORATION and
PORTER COUNTY EDUCATION INTERLOCAL,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
Nos. 00-C-170, 00-C-293—**Rudy Lozano**, *Judge.*

ARGUED MAY 17, 2002—DECIDED AUGUST 19, 2002

Before BAUER, POSNER, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Margaret Todd unilaterally re-
moved her son, R.T., from the defendants' school district
and sought reimbursement from the defendants for R.T.'s
subsequent placement in private school under the Indi-
vidual with Disabilities Education Act ("IDEA"), 20 U.S.C.
§ 1400 *et seq.* Both the Indiana Board of Special Education
Appeals ("BSEA") and the district court found for the de-
fendants, and we affirm.

**I. History**

The IDEA represents "an ambitious federal effort to promote the education of handicapped children." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 179, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982). Its purpose is "to ensure that all children with disabilities have available to them appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d). Among other things, the IDEA supplies the states with federal funding for specialized education services to assist eligible disabled children. In conformity with applicable federal guidelines, the state of Indiana administers those funds through the Indiana Department of Education and its local school systems. *See* IND. CODE § 20-1-6-4.

For each child in need of special education assistance, the state of Indiana convenes an IDEA case conference between the child's parents and local officials to tailor an individualized education plan ("IEP") for the disabled student, which, *inter alia*, identifies how to help the child to advance towards the annual goals outlined in the IEP. *See* 20 U.S.C. §§ 1401(11), 1414(d). Under the IDEA, the IEP must provide each disabled student with a free appropriate public education tailored to his or her individual needs. *See* 20 U.S.C. § 1400(d)(1)(A). A free appropriate public education is one "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." *Rowley*, 458 U.S. at 188-89. Where a state fails to satisfy this statutory mandate, parents have a right to reimbursement for private school tuition. *See Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985).

R.T. is approximately nineteen years old and was first diagnosed as learning disabled in 1993, when he was in the third grade. At that time, Mrs. Todd and the defendants referred R.T. to the Porter County Education Interlocal for testing due to "concerns about his academic progress, especially in the areas of reading and written language." The initial evaluation revealed discrepancies between R.T.'s ability and his actual achievement in the areas of basic reading skills, reading comprehension, and written expression. Consequently, the defendants found that R.T. was eligible for special education services as a learning disabled student in those subjects. Pursuant to the IDEA, the defendants provided special education services to R.T., according to IEPs designed by case conference committees annually through the eighth grade.

Between grades three and six, the IEPs dictated that R.T. receive general educational instruction for most of the day, with direct special education instruction in reading and written language. In other words, R.T. spent most of his day—approximately 86%—in regular education classes but also received forty minutes of daily phonics instruction and other assistance with his written language problems. Further, the IEPs called for special assistance in R.T.'s regular education classes—for example, having his tests read to him and having additional time to complete written assignments.

During the fourth and fifth grades, R.T. took standardized achievement tests and scored within the average national percentile score range in all areas of reading and written language. A reevaluation conducted during the sixth grade revealed considerable gains in the areas of reading and written language, and R.T. no longer demonstrated significant discrepancies between his ability and his achievement in reading and written language. Finally, R.T. obtained all A's and B's in reading and language arts, as well as in other areas of the general

education curriculum up to and including the first quarter of the eighth grade.[1]

During the sixth, seventh, and eighth grades, R.T. continued to receive special education services such as individualized special education instruction, pursuant to annual IEPs. Additionally, R.T. attended a number of "team-taught" classes, which involved more than one instructor. In the eighth grade, although R.T. again earned all A's and B's during the first quarter of the school year, his grades dropped off as the year progressed. Many teachers noted that R.T.'s effort seemed to decrease and surmised that he was having personal problems at home. They were unanimous, however, in their conviction that R.T. was able to complete eighth-grade-level work.

In February 1998, Mrs. Todd became concerned about R.T.'s progress with reading and hired Dr. John Hosterman to evaluate R.T. Dr. Hosterman concluded that R.T. was not performing to his ability in reading, written language, and math. Dr. Hosterman attributed the underachievement to a substantial processing deficit and noted that R.T. had a moderate to severe auditory processing problem. Dr. Hosterman recommended teaching programs different from the ones that defendants had previously used with R.T., specifically, the Orton-Gillingham Program.[2] Dr. Hosterman further recommended an extended school year—i.e., summer school—to assist R.T.

In 1998, the defendants asked Dr. Michael Flahive to perform an audiological evaluation of R.T., and Dr. Flahive found that although R.T. had problems with certain language processing areas, he was quite competent with

---

[1]  R.T. also earned an A in reading and language during the second quarter, although he received C's in math and science.

[2]  The particulars of the Orton-Gillingham Program are not relevant to this appeal.

others. Additionally, the defendants separately evaluated R.T.'s progress. After the testing, Mrs. Todd and the defendants convened R.T.'s annual case review on June 11, 1998 to plan his ninth-grade education program (the "1998 IEP"). In developing the 1998 IEP, the case conference committee considered Dr. Hosterman's independent evaluation, the defendants' 1998 reevaluation, Dr. Flahive's evaluation, R.T.'s grades, teacher input, and Mrs. Todd's input.

Because team-taught classes had helped R.T. previously, the case committee recommended that R.T. be placed in three team-taught classes—English, Biology, and Algebra. The committee also recommended an increase in the amount of special education assistance he received to improve upon the gains made previously through special education classes. For example, the committee recommended that R.T. receive additional support and remedial services in a special education study lab one period per day, five days per week. Half of the period was to be devoted to remedial activities in reading, written language, and math, and the other half of the period was to be devoted to assisting R.T. with his homework. Further, the 1998 IEP provided for special education services in remedial and compensatory reading instruction daily. Thus, the defendants would provide special education reading classes, team-teaching services, and other assistance in the areas of written language and basic math.

In addition to team-teaching and special education classes, the 1998 IEP also proposed several new initiatives that had not been included in previous IEPs, such as bi-weekly consultation with an educational audiologist to review R.T.'s reading program, and numerous modifications to the general education setting and curriculum. Finally, the 1998 IEP proposed that a case conference be convened at the end of the first grading period to review R.T.'s progress and that R.T. be reevaluated by the end of his ninth-grade year.

Prior to the start of ninth grade and although Mrs. Todd had agreed to try the 1998 IEP, she subsequently determined that the 1998 IEP was not satisfactory and unilaterally enrolled R.T. in the Forman School, a private school located in Connecticut that teaches learning disabled children. The following year, Mrs. Todd requested reimbursement from defendants for the expenses incurred in educating R.T. at Forman during the 1998-99 school year and filed a request for a due process hearing with the Indiana Department of Education. The Department appointed an independent hearing officer ("IHO") who identified the following issues to be discussed at the hearing: (1) Was Mrs. Todd entitled to reimbursement for the private expenses that she incurred during the 1998-99 school year? and (2) Did the school district comply with all procedures required under the IDEA and the Americans with Disabilities Act?

The hearing began in November 1999, and by agreement of the parties, the hearing issues were amended to include reimbursement for the 1999-2000, 2000-01, and 2001-02 school years, in which R.T. also attended Forman. After both parties presented evidence, the IHO ruled that the 1998 IEP was not reasonably calculated to enable R.T. to receive some educational benefit and thus violated the IDEA. The IHO then ordered the defendants to reimburse Mrs. Todd for her costs in educating R.T. at Forman for the 1998 to 2002 school years. Because the IHO determined that he lacked the authority to make an award of attorney's fees and costs, Mrs. Todd filed an action in the Northern District of Indiana, seeking fees and costs as the prevailing party.

The defendants then filed a petition for review of the IHO's determination with the BSEA. The BSEA rendered its decision on March 30, 2000, overturning the IHO's decision and concluding that the 1998 IEP was based upon a determination of the unique needs of R.T. as iden-

tified through the June 11, 1998 case conference committee. The BSEA further found that the 1998 IEP was reasonably calculated (1) to provide R.T. with sufficient support services, (2) to permit him to receive the requisite educational benefit and was appropriate to meet his needs, and (3) to provide a free appropriate public education in the least restrictive environment. Accordingly, the BSEA found that the defendants were not required to reimburse Mrs. Todd for her costs in educating R.T. at Forman for the 1998 to 2002 school years.

Mrs. Todd then filed another action with the Northern District of Indiana, seeking reversal of the BSEA's order. Her two cases were consolidated, and the parties agreed to resolve the matter through cross-motions for summary judgment and submit the case to the district court based solely on the administrative record. Before the district court, Mrs. Todd argued that the defendants did not provide a free appropriate public education because (1) they failed to identify R.T. as dyslexic; (2) they failed to consider providing R.T. with year-round instruction; (3) they failed to offer Orton-Gillingham instruction; and (4) the 1998 IEP was vague and insufficient. Additionally, Mrs. Todd argued that the 1998 IEP was not reasonably calculated to provide R.T. with the requisite educational benefit.

The district court rejected Mrs. Todd's argument that the defendants failed to identify R.T. as dyslexic, noting that the record made clear that the defendants had timely and correctly diagnosed R.T. as "learning disabled." *See Heather S. v. Wisconsin*, 125 F.3d 1045, 1055 (7th Cir. 1997) ("The IDEA concerns itself not with labels, but with whether a student is receiving a free and appropriate education."). The district court then addressed Mrs. Todd's argument regarding the extended school year and found that the record established that the June 11, 1998 case conference committee considered an extended school year. The lower court noted that the case conference commit-

tee rejected an extended school year because R.T. had not been shown to regress during school vacations and seemed to progress yearly. Thus, the district court rejected Mrs. Todd's argument that the committee had failed to consider an extended school year.

Next, the district court addressed Mrs. Todd's claim that the 1998 IEP violated the IDEA because it did not offer Orton-Gillingham instruction. The court rejected this claim on several grounds including the fact that the IDEA does not require school districts to employ specific educational methodologies based merely on parental preference. Finally, the district court rejected Mrs. Todd's vagueness and sufficiency challenge based on the detail and breadth of the 1998 IEP.

Mrs. Todd appeals, contending that the district court erred because the 1998 IEP did not satisfy the IDEA.

## II. Analysis

### A. Standard of Review

Although we typically review a district court's grant of summary judgment *de novo*, the standard of review in the present case differs from that governing the typical case. *See Bd. of Educ. of LaGrange Sch. Dist. v. Illinois State Bd. of Educ.*, 184 F.3d 912, 914-15 (7th Cir. 1999). Here, because the district court did not hear additional evidence beyond what was in the administrative record, "[t]he motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Heather S.*, 125 F.3d at 1052. Accordingly, despite being termed summary judgment, the district court's decision is based on the preponderance of the evidence, *see* 20 U.S.C. § 1415(i)(2), and not on whether there are any genuine issues of material fact. However, because courts lack

special expertise in the area of educational policy, we must give "due weight" to the results of the administrative decision and should not substitute our own notions of sound educational policy for those of the school authorities whose decisions we review. *Bd. of Educ. of Murphysboro v. Illinois State Bd. of Educ.*, 41 F.3d 1162, 1166 (7th Cir. 1994).

If there are conflicting decisions on an issue between the two levels of a state administrative review, we must defer to the final decision of the state authorities. *See LaGrange*, 184 F.3d at 915. Thus, in the present case, we must give deference to the decision by the BSEA. Further, because the district court did not hear any evidence beyond what was presented to the administrative judges, we must provide "the usual deference that reviewing courts owe agencies when judicial review is limited to the administrative record." *Sch. Dist. of Wis. Dells v. Z.S.*, 295 F.3d 671, 675 (7th Cir. 2002). Finally, on appeal, Mrs. Todd bears the burden of proof as the party challenging the outcome of the BSEA's decision. *See Patricia P. v. Bd. of Educ. of Oak Park*, 203 F.3d 462, 466-67 (7th Cir. 2000).

## *B.  The IDEA*

Parents like Mrs. Todd who unilaterally change their child's placement without state or local school officials' consent are "entitled to reimbursement *only* if a federal court concludes both that the public placement violated the IDEA and that the private school placement was proper under the Act." *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15, 114 S. Ct. 361, 126 L. Ed. 2d 284 (1993) (emphasis in original). To meet the requirements of the IDEA, a school district must provide each disabled student with a free appropriate public education tailored to his or her individual needs. *See* 20 U.S.C. § 1400(d)(1)(A).

A free appropriate public education is one "specially de-signed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." *Rowley*, 458 U.S. at 188-89. The school district, however, is not re-quired to provide the best possible education. *See Heath-er S.*, 125 F.3d at 1057. There are two basic issues that should be addressed to determine whether a free appro-priate public education has been provided as required un-der the IDEA: (1) Whether the state has complied with IDEA's administrative procedures; and (2) whether the IEP is reasonably calculated to provide some educational benefit to the child. *See Rowley*, 458 U.S. at 206-07.

Here, Mrs. Todd does not make any procedural challenge. Rather, Mrs. Todd only contends that during R.T.'s time at the defendants' schools between grades three and eight, the defendants failed to provide him with the minimum required educational benefit under the IDEA and that despite this failure, the defendants proposed to use sim-ilar teaching methods in the 1998 IEP.

In *Rowley*, the Court addressed whether a student's IEP provided the requisite educational benefit under the IDEA. *See id.* at 202-05. The Court began by noting that the student was "mainstreamed" because she attended regular classes in the public school system. *See id.* at 202-03. Because the student was mainstreamed, the Court focused on the student's grades and her advancement from grade level to grade level in examining whether the student benefitted educationally from the instruction. *See id.* at 203. Additionally, the court noted that the student's IEP provided for unique instruction, such as one hour of individualized instruction from a tutor each day. *See id.* at 184. The Court then found that the combination of the student's progress and the school's particularized services was "dispositive" in determining that the student had received a "free appropriate public education." *Id.* at 203

n.25; *see also Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998) ("A review of objective evidence is easiest, of course, when a disabled child is in a mainstream class. In such circumstances, the attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress."); *Capistrano Unified Sch. Dist. v. Wartenburg*, 59 F.3d 884, 896 (9th Cir. 1995) ("Academic success is helpful guidepost in determining appropriateness of an educational setting in meeting a student['s] unique needs.")

A review of the record leaves us in agreement with the district court and the BSEA that the 1998 IEP satisfied the IDEA.[3] As the district court noted, R.T. received good grades and advanced from grade level to grade level while at the defendants' schools. *See Rowley*, 458 U.S. at 203 n.25. For example, after the school began special education services in the third grade, R.T. continuously received A's and B's up to and including the first quarter of the eighth grade, and earned an A in language and reading during the second quarter as well.

Mrs. Todd, however, contends that R.T. did not deserve promotion from grade level to grade level, and therefore, the

---

[3] Mrs. Todd contends that the district court applied too low a standard when it found that the 1998 IEP gave "more than mere trivial educational benefit." *Cf. T.R. v. Kingwood Township Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000) (rejecting "more than a trivial educational benefit" standard in favor of "meaningful benefit" test). First, and contrary to Mrs. Todd's contentions, the Supreme Court has specifically rejected that the "appropriate education" mandated by IDEA requires states to "maximize the potential of handicapped children." *Rowley*, 458 U.S. at 197 n.21. Further, even if we were to review the 1998 IEP under the Third Circuit's "meaningful benefit" test, we would still affirm as the evidence amply satisfies that somewhat more stringent test.

fact that the defendants promoted R.T. from grade to grade should not weigh in their favor. While we recognize that not every disabled child who is advancing from grade to grade in a regular public school system is automatically receiving a free appropriate public education, *see id.* at 203 n.25, Mrs. Todd does not identify anything in the record to support her contention. On the contrary, we find that R.T.'s classroom test scores show that his yearly promotion was well-earned.[4]

Moreover, even though previous IEPs had benefitted R.T., at Mrs. Todd's direction, the defendants proposed improving on their already successful efforts by adopting bi-weekly consultation and offering intensive services such as a learning disabilities class with one-on-one instruction. Thus, the 1998 IEP contained detailed instructional methods that had worked previously, as well as promised the possibility of additional techniques designed to address R.T.'s unique needs. Mrs. Todd, however, refused to accept these proposals. In light of this credible evidence and giving due weight to the BSEA's findings, we believe that the defendants satisfied their burden to show that the 1998 IEP was reasonably calculated to provide R.T. with the requisite educational benefit. *See id.* (finding that student's "academic progress, when considered with the special services and professional consideration accorded by the . . . school administrators, to be dispositive"); *see also Sch. Dist. of Wis. Dells*, 295 F.3d at 675.

---

[4] Further, we need not rely on R.T.'s grades and advancement and the lack of findings alone, as R.T. also showed improvement in standardized testing. *See*, *e.g.*, *Walczak*, 142 F.3d at 130 (looking to "test scores and similar objective criteria" in certain circumstances). Here, after defendants' began special education services, R.T.'s individualized standardized achievement test scores fell within the national average range in all areas of reading and written language.

Next, Mrs. Todd makes two specific challenges to the district court's and BSEA's findings. First, she contends that the 1998 IEP violated the IDEA because it did not include an extended school year and it was err to find otherwise. Specifically, Mrs. Todd claims that the defendants failed to consider an extended school year in 1998, much less provide an extended school year. This alleged failure, according to Mrs. Todd, constitutes conclusive evidence that the defendants violated the IDEA.

Although the Department of Education does not specify the standards for states to use in determining whether disabled children should receive extended school year services, it has provided some criteria to be considered. *See* 64 Fed. Reg. 12406, 12576 (March 12, 1999). For example, federal regulations provide that the states should consider the likelihood of regression, slow recoupment, and predictive data based upon the opinion of professionals. *See id.* Further, "[t]he determination of whether an individual disabled child needs [extended school year] services must be made by the participants on the child's IEP team. In most cases, a multi-factored determination would be appropriate, but for some children, it may be appropriate to make the determination of whether the child is eligible for [extended school year] services based only on one criterion or factor." *Id.*

At the IHO hearing, Kathy Hensley, the District Coordinator, testified to the following:

Q: Was there any discussion either at the April [1998] case conference or the June case conference of extended school year?

A: There was discussion at both case conferences of extended school year.

Q: What did the case conference determine?

A: The case conference determined that extended school year was not warranted in [R.T.'s] case,

that he had not shown either regression during school vacations or he also had not shown an inability to progress towards mastering the general educational curriculum and the goals and objectives or goals and benchmarks on his I.E.P., from year to year, and it was decided that extended school year was not appropriate for him.

The quoted testimony illustrates that the case conference committee considered and rejected an extended school year, and Mrs. Todd's contention to the contrary is without merit. Further, given the lack of regression, R.T.'s ability to progress, and our deference to the BSEA, we find no error in the defendants' rejection of an extended school year.

Finally, Mrs. Todd contends that the defendants violated the IDEA because even after the previous IEPs, R.T. was unable to read. Like her claim that the defendants did not consider an extended school year, this contention is not supported by the record. As discussed above, R.T.'s reading comprehension scores improved over the years and he even scored within the national average. Therefore, her contention that he could not read is incredible in light of the fact that R.T.'s reading comprehension scores were satisfactory.[5]

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[5] Mrs. Todd does not address whether R.T.'s placement pursuant to the 1998 IEP would have been the least restrictive environment, *see*, *e.g.*, *Sch. Dist. of Wis. Dells*, 295 F.3d 671, and therefore, we need not discuss this issue.

No. 01-3667                                                    15

A true Copy:

     Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
