# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-3096

M.B., by his Parents and Next Friends,
DAMIAN BERNS and AMY BERNS,

*Plaintiffs-Appellants*,

*v.*

HAMILTON SOUTHEASTERN SCHOOLS and
HAMILTON-BOONE-MADISON SPECIAL SERVICES,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:09-cv-00304-TWP-TAB—**Tanya Walton Pratt**, *Judge.*

ARGUED FEBRUARY 22, 2011—DECIDED DECEMBER 22, 2011

Before WILLIAMS and TINDER, *Circuit Judges*, and
GOTTSCHALL, *District Judge.**

GOTTSCHALL, *District Judge.* Damian Berns and Amy
Berns, on behalf of their son, M.B.,[1] appeal the
district court's entry of summary judgment in favor of the

---

* The Honorable Joan B. Gottschall, United States District Judge
for the Northern District of Illinois, sitting by designation.

[1] We refer to M.B. by his initials, as he is a minor.

Hamilton Southeastern Schools and Hamilton-Boone-Madison Special Services (collectively, the "School"), arguing that they are entitled to reimbursement for private education, therapy, and evaluation expenses, as well as their attorneys' fees, because the School violated the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1491 (the "IDEA"), and the provisions relating to special education in the Indiana Administrative Code, 511 Ind. Admin. Code § 7 (2007), by failing to provide M.B. with a free appropriate public education (or "FAPE").[2] For the reasons that follow, we affirm.

## I. BACKGROUND

In October 2007, at the age of four, M.B. was involved in an accident that left him with a traumatic brain injury. M.B. had not yet started kindergarten, and on December 7, 2007, M.B.'s parents asked the School about special education services, including early childhood and extended school year services.

---

[2] 20 U.S.C. § 1401(9) provides, "The term 'free appropriate public education' means special education and related services that—(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title."

Pursuant to Indiana law, once the School learned that M.B. had a suspected disability, the School was to obtain parental consent to evaluate M.B. and then, within sixty instructional days, it was to convene a case conference committee meeting between M.B.'s parents and School officials to develop an individualized education program ("IEP") for M.B. *See* 511 Ind. Admin. Code 7-25-4(b), 7-27-3 (2007). The IEP is a document that describes the child's abilities and measurable goals, as well as the services that a school will provide to assist the child in reaching those goals. *See* 20 U.S.C. § 1414(d)(1)(A)(i).

Although M.B.'s parents did not consent to have the School evaluate M.B. at that time, they did advise the School that they had hired Dr. Bryan Hudson, a neuropsychologist, to evaluate their son. Dr. Hudson completed his evaluation on January 4, 2008, and concluded that M.B. had a "borderline to mild, acute neurocognitive impairment." He warned that even mild impairments often resulted "in major functional consequences" if proactive measures to address the potential issues were not taken, and that academic intervention would likely "facilitate smooth transition from the home to the formal academic environment." (A.R. at 3102-03.)

Shortly thereafter, on January 24, 2008, M.B.'s parents gave the School consent to evaluate M.B. The School's psychologist completed an initial educational evaluation on April 2, 2008. Relying primarily on Dr. Hudson's report, the psychologist suggested that M.B. would benefit from "persistence and consistency in his learning en-

vironments," problem solving support, and level-headed interactions with adults. (*Id.* at 1911.) The psychologist encouraged the case conference committee "to consider the information obtained from this evaluation, along with the results of other multidisciplinary team evaluations and classroom observations and performance, when determining the most appropriate educational programming." (*Id.*)

## A. The April Committee Meeting

The School convened its first case conference committee meeting for M.B. on April 30, 2008. The parents recorded this conference. At that time, the committee determined that M.B. was eligible for services based on his primary disability of "traumatic brain injury" and his secondary disability of "communicative disorder." Dr. Hudson, reporting via telephone, stated that he expected M.B. to have difficulty solving problems and that M.B. needed persistence in presentation, repetition, and consistency. (Apr. CCC Recording Minute 0:22-0:23.)[3] Dr. Hudson noted that one of the easiest ways to achieve those goals was to give M.B. "as much schooling as possible." (*Id.*) He emphasized that year-round schooling would be useful, and that all-day kindergarten would be "ultimate" or "optimal" for M.B. (*Id.*)

Incorporating both Dr. Hudson's findings and the parents' suggestions, the committee developed fourteen

---

[3] This citation is to the recording of the case conference committee meeting made by M.B.'s parents.

goals and objectives as part of M.B.'s IEP. The IEP included goals in the areas of physical therapy, fine motor skills, language development, and academics. (A.R. at 1963.) School officials explained to M.B.'s parents that the School wanted to place M.B. in an early childhood program so that the School could further evaluate him to determine a proper kindergarten placement. This program would include four half-days of early childhood classroom instruction, twenty minutes of occupational therapy each week, an hour of speech therapy twice a week, and twenty minutes of physical therapy each week. School officials suggested convening another case conference committee meeting in May, at which point the committee would make a determination about the services that the School would provide to M.B. during his kindergarten year. The IEP would also enable M.B. to receive extended school year services in June. The parents signed a form indicating their assent to the April IEP, which contained M.B.'s goals and recommendations for services for May 5, 2008 through May 5, 2009.[4]

Before leaving the April meeting, M.B.'s parents asked that M.B. be allowed to attend both morning and afternoon sessions of kindergarten in the fall so that M.B. could obtain the repetitive instruction that Dr. Hudson

---

[4] Although this IEP provided that M.B. would attend Sand Creek Elementary for the next year, it did not otherwise provide for kindergarten-level instruction. The IEP focused upon services through June; summer and fall programming was to be decided at the May committee meeting.

recommended.[5] M.B.'s parents were informed that no one who could respond to that request was present, but that Casey Felus, the Assistant Director of Special Education, would participate in the next committee meeting. When M.B.'s mother expressed concerns about Ms. Felus' role in the decisionmaking process, School representatives assured her that they would consider Dr. Hudson's recommendation, M.B.'s progress over the next four weeks, and the parents' input in determining whether the School could provide such programming, given that there was no "set full-day kindergarten" program in the district. (Apr. CCC Recording Minute 2:02.) Nonetheless, another School representative stated that this process would be a "formality," that full-day kindergarten had been provided in the past, and that full-day kindergarten was not outside the realm of possibility for M.B. (*Id.* 2:03-2:05.)

## B.  The May Committee Meeting

M.B. began receiving early childhood services on May 4, 2008. Approximately four weeks later, on May 29, 2008, the School convened the May committee meeting; the

---

[5]  M.B.'s mother at times referred to this as "full-day kindergarten," although during the May committee meeting, it became clear that she was requesting "double-session" kindergarten, where M.B. would attend identical kindergarten sessions in both the morning and afternoon. By contrast, full-day kindergarten is a general education initiative that contains varied instruction throughout the day.

parents also recorded this conference. Both parents,[6] Casey Felus, and several other School officials attended. Dr. Hudson was not present, nor had he observed M.B. in the school setting.

During this conference, School officials reported that M.B. had done well in his half-day early childhood education sessions. Of the fourteen goals described in M.B.'s IEP, the committee reported that M.B. fully accomplished four of his goals, and he had made progress toward nine others; of those nine goals, he was on track to meet all of them, having made some progress toward six of them and a little progress toward three of them. The only goal for which M.B. had no recorded progress involved moving to a cool-down area with prompting; this could not be assessed because M.B.'s teachers did not experience behavioral problems with M.B.

Notwithstanding M.B.'s progress, M.B.'s mother again requested that M.B. be allowed to attend both the morning and afternoon sessions of kindergarten in the fall. She reiterated Dr. Hudson's opinion that a full day of instruction would be appropriate for M.B.'s needs. School officials informed her, however, that the School did not offer this type of programming, that the School had not allowed other students to attend both sessions of kindergarten, and that any departure from the existing programming would require superintendent approval.

---

[6] While the district court stated that M.B.'s father did not participate in this meeting, M.B.'s father can clearly be heard on the audio recording.

Instead, the School offered to modify M.B.'s IEP to include a half-day of kindergarten as well as additional services (such as speech therapy, physical therapy, and social skills training), some of which would be provided after the morning kindergarten session.[7]

M.B.'s parents declined the offer. They argued that unless the School provided M.B. with a full day of instruction, the School would not be meeting M.B.'s needs. While they held firm on the need for a full day of instruction, they suggested that the instruction could consist of a half day of kindergarten together with either a half day of early childhood services or a half day of first grade. School officials responded that the services the School had provided under M.B.'s IEP were sufficient. They felt that M.B.'s performance over the last four weeks established that M.B. was making progress toward his IEP goals, and that M.B. was ready to advance to kindergarten. M.B.'s parents rejected this conclusion. Having reached an impasse, the meeting ended without M.B.'s parents adopting the revised May IEP. Instead, they declared that they would take the matter up with the superintendent.

---

[7] The School also suggested that M.B.'s parents enroll M.B. in a program called kindergarten plus (K+), an after-school program at the YMCA. As M.B.'s parents noted during the May committee meeting, however, this program was not provided by the School, as the program would have been at the parents' expense.

### C. The Proposed June Committee Meeting

M.B. began receiving extended school year services on June 9, 2008. In the meantime, M.B.'s parents pursued their request for double-session kindergarten with both the superintendent and with Tom Bell, the Director of Special Education. On June 2, 2008, M.B.'s parents asked Bell to review excerpts from the audio they had recorded during the April and May committee meetings. They explained to Bell that Dr. Hudson was concerned that M.B. could exhibit up to 30% memory loss without repetition, and that double-session kindergarten would "minimally accommodate [M.B.'s] needs." (A.R. at 2014.) Nonetheless, on Monday, June 9, 2008, the School once again rejected the parents' request, citing M.B.'s progress as described during the May meeting. (*Id.* at 2015.) Bell also stated that "[i]f [the case conference committee members] saw that [M.B.] was struggling, then they could always go back and change [the IEP]." (*Id.*) On June 11, 2008, Bell offered to speak to Dr. Hudson, but M.B.'s mother rejected the offer. (*Id.* at 2016.)

That same day, M.B.'s parents initiated proceedings before the Indiana State Department of Education. (*Id.* at 2017.) Dr. James Jacobs was appointed as the independent hearing officer ("IHO" or "hearing officer") for M.B.'s due process hearing, which was scheduled to take place in August 2008.

Meanwhile, Bell had offered to convene a third case conference committee meeting on June 19, 2010 to reconsider M.B.'s kindergarten placement. On June 18, 2008, the parents rejected this offer on the advice of counsel.

(*Id.* at 2021.) Instead, the parents offered to attend a mediation session. (*Id.*) The School refused. At this point in time, the School had not provided M.B.'s parents with any written explanation for its decision to deny M.B. double-session kindergarten, nor had it provided M.B.'s parents with his IEP.

M.B.'s extended school year services ended on June 26, 2008. At that point, M.B.'s teacher reassessed M.B.'s performance based on the fourteen goals set forth in his IEP. She believed that M.B. had "maintained or improved his performance" with respect to all of them. (*Id.* at 2027.) In mid-July, M.B.'s parents removed him from the School and placed him in a Lindamood Bell Learning Center. (A.R. at 962.)

On July 7, 2008, Dr. Hudson evaluated M.B. a second time. In his subsequent report—which was based entirely on Dr. Hudson's observation of M.B. in his office—the doctor concluded that M.B. had improved "very little since last evaluated and, in fact, has experienced mild decline in his overall level of functioning." (*Id.* at 3153.) Dr. Hudson opined that M.B. would "require an extended school year given the deficits demonstrated in working memory and consolidation, as [M.B.] will likely lose much of what he has apparently learned if not reinforced in a highly repetitive fashion." (*Id.* at 3154.) He reported a decline in M.B.'s neuropsychological assessment ("NEPSY") scores as well. (*Id.* at 3155.) The parents also obtained letters from pediatrician Victor Nanagas and psychiatrist Laura Wilner; they wrote that full-day kindergarten was "strongly recommended" and

"extremely necessary" to ensure that M.B.'s needs were met. (*Id.* at 3159, 3132.)

### D.  The Due Process Hearing

The due process hearing took place over four days in August. The purpose of the hearing was to determine whether the School had denied M.B. a free appropriate public education. Several witnesses, including Dr. Hudson, Tom Bell, M.B.'s mother, Tracey Mark (M.B.'s early childhood teacher), Dr. Nanagas, and Dr. Christopher Sullivan (the School's neuropsychological witness), testified. All of the information available during both the April and May case conference committee meetings was admitted by the hearing officer; in addition, the hearing officer admitted the post-conference committee evidence from Drs. Hudson, Nanagas, and Wilmer.

At the hearing, the School attempted to discredit the June and July reports from M.B.'s doctors. For instance, Dr. Nanagas admitted that M.B.'s parents had composed his letter, that he had not seen M.B. for the four months preceding the letter, and that he had no medical basis substantiating his opinion. Likewise, Dr. Sullivan testified that Dr. Hudson's credentials had been questioned, Dr. Hudson's NEPSY data may not have been methodologically sound, and that a practitioner should not diagnose a neurological or educational deficit based on the outcome of a single test. (A.R. at 1414-15, 1486, 1495.) He also noted discrepancies in the data between Dr. Hudson's July 2008 report and the conclusions being drawn therefrom. (*Id.* at 1421.)

The hearing officer issued his opinion, which contained 160 findings of fact, on October 8, 2008. Most relevant here are the following:

> "As reflected by the School's ongoing assessments and further supported by testimony, [M.B.] acquired benefit from [early childhood services] in multiple areas. No convincing data to the contrary was presented by [M.B.]." (Finding of Fact No. 28);

> "Each of the School's witnesses testified that [M.B.] made notable gains in all areas observed during the period of time he participated in the School's programs." (Finding of Fact No. 93);

> "The Parents chose to terminate the May [case conference committee meeting] prior to completing discussion regarding [extended school year] services and additional services being proposed for [M.B.] for the 2008-2009 school year. As a result, a revised IEP was not completed at this meeting." (Finding of Fact No. 106);

> "No regression of skills, social, academic, physical, behavioral, or speech has been observed in the school setting. No reliable data that can be attributed to the extent or quality of services provided by the School demonstrate regression in these areas since the initiation of services provided by the school." (Finding of Fact No. 122); and

> "The May [case conference committee] adjourned without parties having reached agreement regarding services to be provided [M.B.] for the 2008-2009 school year." (Finding of Fact No. 160).

Several findings of fact acknowledged Dr. Hudson's July report, as well as the opinions of Drs. Nanagas and Wilmer. (Findings of Fact 20-22, 59-68.) Although the hearing officer found that the School committed some procedural errors, such as initially failing to provide the parents with a copy of M.B.'s IEP or written notice of its decision to deny M.B. double-session kindergarten, the hearing officer concluded that these errors "did not result in substantive harm." (A.R. at 3408, 3415.) The hearing officer further found that the School had not denied M.B. a free appropriate public education. Thus, he denied any substantive relief to M.B., including reimbursement for M.B.'s placement in the Lindamood Bell Learning Center.

### E.  The Board of Special Education Appeals

M.B.'s parents appealed the hearing officer's decision to the Indiana Board of Special Education Appeals (the "Board"). The Board issued its decision on February 10, 2009. The Board noted that it could not disturb the hearing officer's findings of fact or conclusions of law unless those conclusions were arbitrary and capricious, an abuse of discretion, or unsupported by substantial evidence. (Board Op. at 31 ¶ 1.) Applying this standard of review, the Board upheld 157 of the hearing officer's 160 findings, including those set forth above. The Board reversed the hearing officer on a few points, however. For instance, it determined that not all required participants were in attendance at the May committee meeting; in particular, no general education kindergarten teacher

had been available to address the merits of a full-day kindergarten placement. (*Id.* at 33 ¶ 11.)

Still, the Board concluded that M.B. failed to show that any procedural violation "significantly impeded the parents' opportunity to participate in the decision-making process" or "caused a deprivation of educational benefits." (*Id.* at 33 ¶ 14.) The Board confirmed that M.B. did not require a full-time kindergarten program in order to receive a free appropriate public education. (*Id.* at 32 ¶ 10.) Thus, it too denied the parents' requested relief.

## F. The District Court

Following the Board's decision, M.B.'s parents exercised their statutory right to file suit in the district court. *See* 20 U.S.C. § 1415(i)(2)(A). Although they were allowed to supplement the record, *see id.* § 1415(i)(2)(C)(ii), they did not do so. The district court completed its own review of the administrative record and, after according due weight to the Board's findings of fact and reviewing the Board's legal conclusions *de novo*, *see Marshall Joint Sch. Dist. No. 2 v. C.D. ex rel. Brian D.*, 616 F.3d 632, 636 (7th Cir. 2002), the court denied the parents' request for relief. *See M.B. v. Hamilton Se. Schs.*, No. 1:09-cv-0304-TWP-TAB, 2010 WL 3168666 (S.D. Ind. Aug. 10, 2010).

The district court began its analysis by noting that because the parents were seeking only compensatory relief, the focus would be on whether the School provided M.B. with a free appropriate public education, not whether the School complied with all of the pro-

cedural requirements of the IDEA. In other words, any procedural deficiencies were important only insofar as those deficiencies denied M.B. a FAPE. *Id.* at *5. In M.B.'s case, the court agreed with the Board that any procedural errors were harmless; for instance, the lack of a kindergarten teacher at the May committee meeting was immaterial to the School's denial of a double-session kindergarten placement since that decision was to a large extent based upon "M.B.'s positive progress"—an issue about which the kindergarten teacher could not have provided useful input at the May meeting. *Id.* The court did not address every purported procedural error, but it suggested that M.B.'s parents had played an active role in the crafting of M.B.'s IEP, noting that they "had participated in approving the progress goals and the IEP to be followed." *Id.* at *6. The district court also noted that the School had satisfied its "child find" obligation because it convened a case conference within sixty instructional days from receiving parental consent, as required by the Indiana Administrative Code, 511 Ind. Admin. Code § 7-25-4(b) (2007). *M.B.*, 2010 WL 3168666 at *5.

The court concluded that deference was owed to the hearing officer's and Board's determination that M.B. was receiving a free appropriate public education. In particular, at the time the parents "drew a line in the sand" and decided to stop interacting with the case conference committee, all indications were that M.B.'s IEP was producing results, and there was no reason to think that the proposed future plan "would not have yielded similar positive results." *Id.* at *7. Further, the

School remained amenable to monitoring and adjusting M.B.'s IEP on an as-needed basis.

In addition, the parents had provided no evidence to establish the propriety of M.B.'s Lindamood Bell placement, and for this reason as well the court declined to order the School to reimburse the parents. The parents now appeal.

## II. LEGAL STANDARD

As we have often noted, our standard of review in IDEA summary judgment cases differs from the norm. *See Todd v. Duneland Sch. Corp.,* 299 F.3d 899, 904 (7th Cir. 2002)*.* In particular, where (as here) the district court reviews only that evidence that was before the administrative tribunal, "'[t]he motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.'" *Id.* (quoting *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997)). While this court reviews legal issues *de novo, see Brian D.*, 616 F.3d at 636, we give "due weight" to the factual determinations of the administrative tribunals. *Todd*, 299 F.3d at 904. In other words, we provide "'the usual deference that reviewing courts owe agencies when judicial review is limited to the administrative record.'" *Id.* (quoting *Sch. Dist. of Wis. Dells v. Z.S.*, 295 F.3d 671, 675 (7th Cir. 2002)). This review is equivalent to a "clear-error" or "substantial-evidence" standard. *See Z.S.,* 295 F.3d at 675. As a result, the party challenging the outcome of the administrative

proceedings bears the burden of proof. *See Alex R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 611 (7th Cir. 2004).

### III. DISCUSSION

M.B.'s parents advance several arguments on appeal. First, they argue that M.B. was denied a free appropriate public education due to the School's violation of IDEA's procedural and substantive requirements. Second, they argue that the School violated its "child find" obligations, *see* 20 U.S.C. § 1412(a)(3), and the special education provisions of the Indiana Administrative Code, *see* 511 Ind. Admin. Code 7-25-2 (2007), because, although M.B.'s parents notified the school of M.B.'s injury by early December 2007, the School did not provide M.B. with services until May 2008. Third, M.B.'s parents argue that M.B.'s placement in the Lindamood Bell program was appropriate and that they should be reimbursed. And finally, citing 20 U.S.C. § 1415(i)(3)(B) and 511 Ind. Admin. Code 7-30-6 (2002), M.B.'s parents contend that they are entitled to their attorneys' fees.

### A. Free Appropriate Public Education

Under the IDEA, "a state that accepts federal funding to educate disabled children must provide such children with an education that is free, public, and appropriate." *Alex R.*, 375 F.3d at 606. "The school district, however, is not required to provide the best possible education." *Todd*,

299 F.3d at 905. Rather, the statute requires only that a student's IEP be "reasonably calculated to enable the child to receive an educational benefit." *Evanston Comm. Consol. Sch. Dist. No. 65 v. Michael M.*, 356 F.3d 798, 802 (7th Cir. 2004); *see Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 203 (1982) (noting that a school satisfies the FAPE requirement when it provides "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction"). There is both a procedural and substantive component to the IDEA. *See Rowley*, 458 U.S. at 206-07; *Michael M.*, 356 F.3d at 802.

## 1.  Procedural Adequacy

The IDEA seeks to "assure[ ] the parents an active and meaningful role in the development or modification of their child's IEP." *Hjortness v. Neenah Joint Sch. Dist.*, 507 F.3d 1060, 1064 (7th Cir. 2007). But procedural defects do not necessarily indicate that a child has been denied a free appropriate public education; only those defects that "result in the loss of educational opportunity" deny a child a FAPE. *Id.* at 1065 (citing *Bd. of Educ. v. Ross*, 486 F.3d 267, 276 (7th Cir. 2007)).

First, M.B.'s parents argue that the School predetermined M.B.'s placement in advance of the May conference committee meeting. Such a predetermination may, in some instances, be the type of procedural defect that deprives a child of a FAPE. *See, e.g.*, *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 857 (6th Cir. 2004) (where a

"predetermination amounted to a procedural violation of the IDEA" and had the effect of depriving the parents of meaningful participation in crafting their child's IEP, the predetermination deprived the child of a FAPE). But here, the parents have provided no evidence to suggest that such a predetermination took place. Instead, the facts establish that the School was willing to make adjustments to M.B.'s IEP based upon input from M.B.'s parents. Indeed, the School relied on Dr. Hudson's report to generate many of M.B.'s goals and objectives. In short, the parents have not met their burden of establishing any type of procedural defect based upon predetermination, much less one that rises to the level of a substantive denial of a FAPE.

Next, the parents point to the School's failure to include a general kindergarten teacher at the May committee meeting, and cite *Deal* to support their argument that this failure deprived M.B. of a free appropriate public education. But in *Deal*, the Sixth Circuit specifically found that the teacher would have had a "real impact on the decision-making process." 392 F.3d at 861. Here, by contrast, the district court found that a general kindergarten teacher could have had no significant input as to the appropriateness of a double-session kindergarten placement, because the School's decision to deny that request "was based on M.B.'s positive progress and an administrative policy." *M.B.*, 2010 WL 3168666, at *5. Thus, the court concluded, and we agree, that the lack of a general kindergarten teacher at the May committee meeting did not affect M.B.'s placement. *Id.* As such, the procedural error cannot amount to a denial of a free appropriate public education.

M.B.'s parents also argue that M.B. was denied a FAPE as a result of the School's failure to include someone who could "authorize" double-session kindergarten as part of the May conference. Again, we agree with the district court: the statute does not require the presence of one who can authorize a proposed placement. Rather, it merely requires the presence of an agency representative who "is knowledgeable about the general education curriculum" and "about the availability of resources of the local educational agency." 20 U.S.C. § 1414(d)(1)(B)(iv). Casey Felus met those requirements.

Moreover, M.B.'s parents claim that the School's failure to provide them with prior written notice of its decision to deny a double-session kindergarten placement denied them an opportunity meaningfully to participate in crafting M.B.'s IEP. *See* 20 U.S.C. § 1415(b)(3)(B) (requiring written prior notice to be provided when the school district "refuses to initiate or change"). But the purpose of this requirement is to ensure that parents are aware of the decision so that they may pursue procedural remedies. *See, e.g., J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 459 (9th Cir. 2010) (suggesting that formal notice of a proposed placement "will greatly assist parents in presenting complaints" regarding that placement); *A.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 682 (4th Cir. 2007) (noting that the policies served by prior written notice include "creating a clear record of the educational placement" and "assist[ing] parents in presenting complaints"). Here, M.B.'s parents were well aware of the School's refusal to provide double-session kindergarten, as evidenced by

their decision to initiate a due process complaint. The lack of prior written notice did not impair the parents' ability to participate in the process, and the hearing officer did not clearly err when he determined that this omission "in no way resulted in harm to the Student." (A.R. at 3415.)

Finally, while M.B.'s parents did not receive a copy of his IEP precisely on time, the plan was promptly delivered to the parents' counsel, and counsel had it at their disposal for the duration of these proceedings. The same is true of M.B.'s educational records, which were obtained by counsel and are now part of the record. Like the provision for prior written notice, the purpose of the IDEA's record disclosure provision is to ensure that parents can review a school district's decisions and pursue due process remedies for those decisions with which they do not agree. That purpose has been fulfilled here. The parents have provided no reason to believe that any procedural errors substantively prevented M.B. from receiving a FAPE.

In sum, the hearing officer, the Board, and the district court concluded that M.B. was not substantively affected by any procedural errors, and it is the parents' burden to convince this court otherwise. M.B.'s parents have not carried that burden.

## 2. Substantive Adequacy

Even if the district's procedural missteps did not deny M.B. a free appropriate public education, we still must

consider whether M.B.'s IEP substantively provided him with a FAPE. We reiterate that an IEP is reasonably calculated to enable the child to receive an educational benefit "when it is 'likely to produce progress, not regression or trivial educational advancement.'" *Alex R.*, 375 F.3d at 615 (quoting *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 248 (5th Cir. 1997), and citing *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998)). To prevail on their substantive claim, then, M.B.'s parents must convince this court that the hearing officer, the Board, and the district court clearly erred in determining that M.B. was making progress under his IEP. *See M.B.*, 2010 WL 3168666, at *7 (citing *Rowley*, 458 U.S. at 209-20, and *Todd*, 299 F.3d at 905-07).

We conclude that there is nothing unreasonable about that determination. The record establishes that M.B. made progress toward his IEP goals not only upon receiving early childhood services, but also while receiving extended school year services. Given that M.B. was making progress toward his IEP goals while receiving half-day, early-childhood services, it was reasonable for the committee to conclude that M.B. did not require double-session kindergarten to meet his needs.

While other evidence—particularly Dr. Hudson's July NEPSY findings—suggests that M.B. had regressed during May and June 2008, there is no reason to give Dr. Hudson's report or testimony dispositive weight. First, Dr. Christopher Sullivan's testimony called into question many of Dr. Hudson's conclusions. Second, this court has expressed the view that it is inappropriate to

defer to the opinion of a single psychologist, particularly where that opinion is in conflict with the opinions of "teachers and other professionals." *See Heather S.*, 125 F.3d at 1057 ("[T]he deference is to trained educators, not necessarily psychologists. While the latter certainly have a role to play, and can contribute meaningful insight to the evaluation of a student, the school district is required to bring a variety of persons familiar with a child's needs to an IEP meeting, including, specifically, teachers."); *see also Brian D.*, 616 F.3d at 641 ("[Although] a physician's diagnosis and input on a child's medical condition is important and bears on the team's informed decision on a student's needs . . ., a physician cannot simply prescribe special education . . . ."). In fact, the School was obliged to consider a broad range of evidence in assessing M.B.'s progress, and was precluded from relying upon "any single measure or assessment as the sole criterion for determining  . . . an appropriate educational program for the child." *See* 34 C.F.R. § 300.304(b)(1)-(2).

In any event, the appropriateness of an IEP "can only be judged by examining what was objectively reasonable at the time" the case conference committee created the IEP. *M.B.*, 2010 WL 3168666, at *6 (citing *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990)). That is, an IEP must be "evaluated prospectively and not in hindsight." *See Bd. of Educ. of Comm. Consol. Sch. Dist. No. 21 v. Ill. State Bd. of Educ.*, 938 F.2d 712, 717 n.4 (7th Cir. 1991). With that in mind, it was reasonable to discount Dr. Hudson's July report and subsequent testi-

mony in considering whether the May IEP denied M.B. a FAPE. Because the record supports the conclusion that M.B. was making progress toward his IEP goals as of the May committee meeting, it was reasonable for the administrative tribunals to conclude both that M.B. did not require double-session kindergarten, and that the proposed IEP was reasonably calculated to confer an educational benefit on M.B.

### B.  The School's Child-Find Obligations

M.B.'s parents further argue that the School violated its "child find" obligations because, although it learned of M.B.'s injury by December 2007, it did not begin to provide M.B. with services until May 2008. The district court concluded that the School complied with 511 Ind. Admin. Code § 7-25-4(b) (2007), which mandates that a school district evaluate a student within sixty instructional days of receiving parental consent for an evaluation, and thereby satisfied its "child find" obligations. We agree. Indiana required school districts to obtain consent prior to evaluating a student for purposes of crafting an IEP. *Id*. Here, the School did not receive consent until January 24, 2008, and the School completed its evaluation on or about April 2, 2008—within the sixty instructional day limit. Thus, the School satisfied its obligation.

M.B.'s parents, however, argue that the School was required to be more proactive even without their formal consent. At the time M.B.'s parents first began to explore special education services for M.B., Indiana law required a public agency to take additional steps when it

was unable to obtain parental consent. *See* 511 Ind. Admin. Code. § 7-25-1 (2007) ("No student shall be denied a free appropriate public education as a result of a public agency's inability to obtain parental consent for an initial evaluation . . . . The public agency may pursue mediation but shall pursue a due process hearing in an effort to resolve the issue of the public agency's inability to secure parental consent for an initial evaluation."). But here, M.B.'s parents never refused to provide consent; rather, as the parents admit, they clearly indicated to the School that they intended to give permission to evaluate their child, and they did so on January 24, 2008. This is not a situation like *E.N. ex. rel. Nesbitt*, an Indiana case interpreting § 7-25-1 and noting that, in a case where a parent flatly refused to consent to an IEP, the school was not relieved of its duty to evaluate a student. *See E.N. ex rel. Nesbitt v. Rising Sun-Ohio Cty. Comm. Sch. Corp.*, 720 N.E.2d 447, 453 (Ind. Ct. App. 1999). Without any indication that the School would be unable to obtain parental consent for the initial evaluation, the School's obligation to pursue mediation or a due process hearing was never triggered. Because the School conducted its evaluation within sixty instructional days of receiving parental consent, it fully complied with its "child find" obligations.

### C. Reimbursement

As previously noted, M.B.'s parents removed M.B. from the School and placed him in a Lindamood Bell Learning Center. They seek reimbursement for this placement. M.B.'s parents are not entitled to any reimbursement.

Parents "who unilaterally change their child's placement without state or local school officials' consent are 'entitled to reimbursement *only* if a federal court concludes both that the public placement violated the IDEA *and* that the private school placement was proper under the Act.'" *Todd*, 299 F.3d at 905 (quoting *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993) (second emphasis added)). Even assuming that the School violated the IDEA, M.B.'s parents failed to carry their burden of presenting evidence to show that M.B.'s placement at Lindamood Bell was appropriate.

Counsel conceded at oral argument that the evidence M.B.'s parents provided to establish the propriety of the Lindamood Bell placement was "general" and "deficient in detail." Although M.B.'s parents claim that M.B.'s alternative placement must have been successful because he performed well in the second grade in another school district, the only evidence offered in support of this assertion is Lindamood Bell's good reputation and general information about the program from M.B.'s parents.[8] This is not enough. And while M.B.'s parents contend that they did not have an adequate opportunity to present evidence to the hearing officer, nothing pre-

---

[8] M.B.'s mother testified that M.B. was attending "an intense one-on-one program" through Lindamood Bell for three hours per day, five days a week; M.B.'s father offered www.lindamoodbell.com as a source of additional information; and M.B.'s mother conceded that she did not think she or her husband had any specific information about the program. (A.R. at 1176, 1185.)

vented M.B.'s parents from submitting additional evidence to the district court. *See* 20 U.S.C. § 1415(i)(2)(C)(ii).

### D. Attorneys' Fees

Finally, citing 20 U.S.C. § 1415(i)(3)(B) and 511 Ind. Admin. Code 7-30-6 (2002), M.B.'s parents contend that if they prevail on any aspect of the question of whether the School denied M.B. a free appropriate public education, then they will be considered the prevailing party and are entitled to attorneys' fees. As they have not prevailed on any aspect of their claim, M.B.'s parents are not entitled to attorneys' fees. *See Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) (noting that "the most critical factor" in determining the reasonableness of a fee award "is the degree of success obtained").

### IV. CONCLUSION

The hearing officer, the Board, and the district court unanimously agreed that the School did not deny M.B. a free appropriate public education. Given both *Rowley* and our standard of review, we cannot disagree with that conclusion. Thus, this court affirms the judgment of the district court.